Filed 1/19/16  (unmodified opn. attached)

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO RODRIGUEZ LEON,<br><br>Defendant and Appellant. | F065532<br><br>(Super. Ct. No. F10902527)<br><br>**ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT]** |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DANIEL MENDOZA RIVAS,<br><br>Defendant and Appellant. | F065533<br><br>(Super. Ct. No. F10902527) |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>VICTOR CENTENO,<br><br>Defendant and Appellant. | F065746<br><br>(Super. Ct. No. F10902527) |

THE PEOPLE,

       Plaintiff and Respondent,

           v.

ROBERT PALOFOX,

       Defendant and Appellant.

F066004

(Super. Ct. No. F10902527)

---

**THE COURT:**

It is ordered that the opinion filed herein on January 13, 2016, be modified as follows:

1. Strike the footnote at the bottom of page 1, which begins "Pursuant to" and insert the following footnote in its place: "Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., II., III., IV., V., VII.B. and VII.C. of the Discussion."

2. On page 60, immediately following the first full paragraph, insert "VII." before the word "Sentencing".

The modification does not effect a change in the judgment.

_____

GOMES, J.

WE CONCUR:

_____

HILL, P.J.

_____

DETJEN, J.

2.

Filed 1/13/16 (unmodified version)

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>              v.<br><br>ALEJANDRO RODRIGUEZ LEON,<br><br>        Defendant and Appellant. | F065532<br><br>(Super. Ct. No. F10902527)<br><br><br>**OPINION** |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>              v.<br><br>DANIEL MENDOZA RIVAS,<br><br>        Defendant and Appellant. | F065533<br><br>(Super. Ct. No. F10902527) |

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., II., III., IV., VI.B. and VI.C. of the Discussion.

| | |
|---|---|
| THE PEOPLE, | F065746 |
| Plaintiff and Respondent, | (Super. Ct. No. F10902527) |
| v. | |
| VICTOR CENTENO, | |
| Defendant and Appellant. | |
| | |
| THE PEOPLE, | F066004 |
| Plaintiff and Respondent, | (Super. Ct. No. F10902527) |
| v. | |
| ROBERT PALOFOX, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Fresno County. Wayne R. Ellison, Judge.

John Hardesty, under appointment by the Court of Appeal, for Defendant and Appellant Alejandro Rodriguez Leon.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Mendoza Rivas.

Hilda Scheib, under appointment by the Court of Appeal, for Defendant and Appellant Victor Centeno.

Cheryl Rae Anderson, under appointment by the Court of Appeal, for Defendant and Appellant Robert Palofox.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Brian G. Smiley and Laura Wetzel Simpton, Deputy Attorneys General, for Plaintiff and Respondent.

--

Victor Centeno, Alejandro Rodriguez Leon (Leon), Robert Palofox, and Daniel Rivas were tried together on charges of conspiracy and other felonies arising from a series of home invasion robberies committed in the counties of Fresno and Merced in early 2010. Their trials were severed from those of alleged co-conspirators with whom they were indicted in connection with these events. Centeno, Leon, and Palofox each received life sentences for their role in the conspiracy based on a jury's findings that the robberies were gang-related. Gang allegations were found not true as to Rivas, who was sentenced to a total of 22 years in prison. We have consolidated the parties' individual appeals for purposes of briefing and decision.

Appellants allege error with respect to the admissibility of various evidence used at trial and the sufficiency of the evidence supporting certain convictions. The trial court's sentencing decisions are challenged on multiple grounds. There are also assertions of constitutionally deficient performance by trial counsel, as well as a claim that racial discrimination tainted the jury selection process. We affirm in part and reverse in part.

In the published portion of the opinion, we apply the California Supreme Court's recent decision in *People v. Elizalde* (2015) 61 Cal.4th 523 (*Elizalde*) to resolve challenges to evidence of gang affiliation admissions made by Centeno and appellants' co-conspirators when they were booked into jail. We conclude any prohibited use of Centeno's admission was harmless error, and that the self-incriminating statements were not testimonial for purposes of the constitutional right to confront adverse witnesses. Our

published discussion further holds that trial courts have discretion under Penal Code[1] section 669 to impose concurrent sentences for gang-related offenses punishable under the alternate penalty provisions of section 186.22, subdivision (b)(4).

## STATEMENT OF THE CASE

The underlying events occurred in February and March of 2010 when a group of people from Arizona, working in conjunction with an individual who lived in California, carried out a series of home invasion robberies in the cities of Atwater, Clovis, Kerman, and Selma. The crimes were carefully coordinated, sometimes involving upwards of 10 perpetrators, and followed the same general pattern. The men would split up into two groups of lookouts and intruders, with the former stationing themselves in parked cars at strategically selected locations and maintaining communication with the intruders over cell phones and "walkie-talkies." The intruders, meanwhile, would enter homes and force the occupants inside to surrender cash, gold, and other items of value. Armed with guns, they threatened to kill their victims and used violence to extract information about the location of money and valuables. The victims were sometimes tied up with electrical cords and other makeshift restraints. In three of the five incidents, an automobile was stolen during the course of the robbery.

A joint investigatory effort by law enforcement agencies in California and Arizona led to the arrest and prosecution of nine suspects. On March 22, 2011, a Fresno County grand jury returned an 18-count indictment against appellants and their accomplices, Gilbert Beltran, Christopher Escobedo, Estevan Landeros, Christian Rodriguez, and Eric Rodriguez. Count 1 of the indictment charged all parties with criminal conspiracy in violation of section 182, subdivision (a)(1). Leon and Rivas, along with co-conspirators Estevan Landeros and Christian Rodriguez, were each charged in Counts 2 through 18 for their respective roles in the five robberies. All parties, including Centeno and Palofox,

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

4.

were charged in Counts 11 through 18 for their participation in the last two of those robberies. Centeno, who was 17 years old at the time of the offenses, was charged as an adult pursuant to Welfare and Institutions Code section 707, subdivision (d)(1).

Appellants were tried before a Fresno County jury in May and June 2012. A bifurcated trial was conducted on gang allegations that were made pursuant to section 186.22, subdivision (b). Trial evidence relevant to the claims on appeal is described within the body of our Discussion.

The first two robberies occurred on February 24, 2010 in Clovis and Atwater. For his part in the Clovis robbery, Rivas was convicted of robbery in concert (§§ 211, 213, subd. (a)(1)(A); Count 2), false imprisonment by violence (§§ 236, 237; Count 3), and using threats or violence to prevent or dissuade a victim from reporting a crime (§ 136.1, subd. (c)(1); Count 4). In relation to the Atwater robbery, Rivas was convicted of robbery in concert (Count 5), assault by means likely to cause great bodily injury (§ 245, subd. (a)(1); Count 6), false imprisonment by violence (Count 7), and vehicle theft (Veh. Code, § 10851, subd. (a); Count 8). He was also found guilty of conspiracy under Count 1. Leon was convicted of conspiracy as well, but was acquitted on Counts 2 through 8.

The third robbery took place in Kerman on March 15, 2010. For this incident, Leon and Rivas were convicted of robbery in concert (Count 9) and false imprisonment by violence (Count 10). As to Leon, the robbery was found to be gang-related within the meaning of section 186.22, subdivision (b).

The fourth and fifth robberies occurred on March 16, 2010 in Atwater and Selma. For the (second) Atwater robbery, all appellants were convicted of robbery in concert (Count 11), false imprisonment by violence (Count 12), assault with a semiautomatic firearm (§ 245, subd. (b); Count 13), making criminal threats (§ 422; Count 14), and vehicle theft (Count 15). In regards to the Selma robbery, appellants were convicted of robbery in concert (Count 16), false imprisonment (Count 17), and vehicle theft

5.

(Count 18). As to Centeno, Leon, and Palofox, the robberies were found to be gang-related. Enhancement allegations for personal use of a firearm within the meaning of section 12022.5, subdivision (a) were found true as to Leon on Counts 11 and 12.

Leon was sentenced to an aggregate term of 48 years to life in prison. For robbery in concert under Counts 9, 11, and 16, he received consecutive terms of 15 years to life based on the alternate penalty set forth in section 186.22, subdivision (b)(4)(B). A consecutive three-year term was imposed for the gun enhancement attached to Count 11. Concurrent terms were imposed for Counts 14, 15, and 18, with all other sentences stayed.

Centeno and Palofox received sentences of 30 years to life in prison based on the gang-related robbery convictions on Counts 11 and 16. Concurrent terms were imposed for Counts 13, 14, 15, and 18. All other sentences were stayed.

Rivas was sentenced to a total of 22 years in prison as follows: The upper term of 9 years under Count 2 for robbery in concert, plus consecutive two-year terms (one-third of the middle term) for each robbery in concert conviction under Counts 5, 9, 11 and 16, plus a consecutive three-year term for Count 4, and a consecutive two-year term for Count 13. Concurrent terms were imposed as to Counts 8, 14, 15, and 18. Stayed sentences were imposed for all remaining counts.

## DISCUSSION

### I. Palofox's Ineffective Assistance of Counsel Claim

Palofox contends that one or more attorneys who represented him below failed to convey material information about a plea offer. If true, such failures might entitle him to relief on grounds of ineffective assistance of counsel. The record, however, does not substantiate his allegations of deficient performance and prejudice. We therefore reject his claim.

6.

<u>Background</u>

Palofox was represented at the earliest hearings in the case by Nancy Wong, who then worked as a deputy public defender in Fresno County. Ms. Wong made at least four court appearances on behalf of Palofox during the months of June, September, and December 2010. While stating her appearance on September 14, 2010, Ms. Wong noted that she was "standing in for Roberto Dulce," referring to another deputy public defender in her office. Mr. Dulce had at that point made two prior court appearances with Palofox during the month of August, and later represented him at a hearing held on October 12, 2010.

On December 3, 2010, Ms. Wong attended a court hearing with Palofox where the topic of plea bargains arose during a discussion about scheduling. The reporter's transcript reflects that an unidentified defense attorney said, "My only concern is that we just got handed written offers in court today, and it says that the offer will remain open until the next pre-prelim set after today's date. Does that mean and only then, or then they will be withdrawn or will it be – " The prosecutor interrupted with the following remarks: "Your Honor, I did hand written offers to each counsel today. Those will remain open until the next pre-prelim hearing date. The People's understanding, that would be January 13. I don't want set beyond that."

The next hearing took place on January 13, 2011. Palofox's eventual trial counsel, deputy public defender Peter Pacheco, appeared with him in court on this date. The hearing began with the prosecutor stating: "There were written offers submitted at the last pre-preliminary hearing on December 3rd. All of those written offers are being withdrawn this date as per the written offer." Mr. Pacheco responded, "And the record should note, also, your Honor, on behalf of Mr. Palofox, Mr. Dulce was the attorney of record previously. I do not know whether Mr. Dulce ever discussed the written offer

7.

with Mr. Palofox.  However, I am substituting in today for the public defender and I guess I'll need to talk to the DA concerning the written offer."[2]

The next mention in the record of plea bargaining is found within the transcript of a hearing held on October 24, 2011.  Mr. Pacheco and Palofox were present in court when the following statements were made:

Trial Court: "One last thing before I go off the record completely, I want to say this with the defendants present.  We've had some discussion in chambers about the settlement offers that have been made by the People pursuant to a letter that I understand was provided to all counsel [i.e., the December 2010 written offer].  Although this may have been a letter that was provided so early on that some of you attorneys were not actually counsel of record at this particular point in time when this was done, it was – as I understand it from you, [prosecutor], this was a letter that was sent by the District Attorney's office making an offer of possible disposition of this case to the defendants based on a term of years.  And it was conveyed before this case went to grand jury indictment, correct?

Prosecutor: That's correct.

Trial Court: And from the People's point of view, at least at the moment, those offers are considered having been rejected?

Prosecutor: That's correct.

Trial Court: I'm not going to inquire on the record whether any of you counsel agree with that interpretation.  But I do want to say, and I don't want there to be any misunderstanding about this subject, the People have alleged a gang enhancement on alleged home invasion robberies.  And I think it is understood by all counsel here that at least under [section] 186.22(b)(4) –

Prosecutor: Correct.

Trial Court: – the penalty for that is 15 years to life in the state prison?  No misunderstanding about that?

---

[2] The written offer does not appear in the record, but the parties agree that Palofox would have been able to plea out for a fixed term of 16 years and 8 months in prison.  As noted above, he was ultimately sentenced to an indeterminate term of 30 years to life.

Prosecutor:    That's correct.

The trial court made another reference to the expired December 2010 offer at a hearing held on January 6, 2012. Further settlement discussions occurred during proceedings conducted on March 29, 2012 and April 12, 2012. Mr. Pacheco and Palofox were present in court on each of these dates.

On April 19, 2012, Mr. Pacheco made statements in court upon which Palofox now bases his claim of ineffective assistance of counsel. We reproduce here the relevant portion of the transcript from that hearing:

Trial Court:  And, um, the [current settlement] offer to Mr. Palofox, is it [33 years]?

Prosecutor:   It is, Your Honor.

Trial Court:  It is with the 45-year-to-life exposure. That's you, sir? You understand all of this?

Palofox:      Yes, I do.

Trial Court:  You've had a chance to talk to Mr. Pacheco about, you know, what you have at risk, what the case looks like. And you know what the People's offer is –

Palofox:      Yes.

Trial Court:  – right? And you made a decision?

Palofox:      Yes, I have.

Trial Court:  What do you want to do, sir?

Palofox:      Take it to trial.

Trial Court:  You are satisfied you know what this – what this means, right?

Palofox:      Yes, I do.

Trial Court:  And Mr. Pacheco, you are satisfied that Mr. Palofox here knows what he's got at risk and is making a reasoned decision in this matter?

9.

Pacheco: Yes, Your Honor. There was a little wrinkle that we discussed yesterday. When this case was first assigned it was assigned to Roberto Dulce. And it was [assigned] to Kathy Marousek. It was – both left on stress leave. I inherited this case. As [to] the [offer of] 16 years eight months, I believe that was a time sensitive letter that I was never, um – let's say due to the transfer of the case to myself there was an issue whether that was conveyed to Mr. Palofox, whether it was time sensitive. Um-

Trial Court: Well –

Pacheco: However, that's the only thing I want to put on the record.

Trial Court: And I've allowed you to put it on the record and you have. But from your point of view, what does it mean? Should the court do something?

Pacheco: Well, I just wanted the People to know he would have accepted the 16 years, eight months, but for the fact that it was time sensitive. And he was not advised of that by [his] prior [] counsel. We're ready to go on the 21st.

Trial Court: Anything you want to say about that?

Prosecutor: Just that I put all these offers on the record including the time sensitive nature of them for everyone to hear.

Trial Court: In other words, you made – you didn't just send a letter. You actually stated it in court?

Prosecutor: I did both, yes.

Palofox's contention on appeal is that his attorneys failed to make him aware of the time-sensitive nature of the December 2010 offer before it expired. He further submits that he would have accepted the offer had he known it would only be available for a limited time. The remedy sought is reversal and remand, with an order requiring the prosecution to "reoffer" the original plea deal.

Analysis

"To demonstrate that a defendant has received constitutionally inadequate representation by counsel, he or she must show that (1) counsel's representation was

10.

deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; *and* (2) counsel's deficient performance subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*In re Alvernaz* (1992) 2 Cal.4th 924, 936-937.) Proof of a defense attorney's failure to adequately advise his or her client about the terms of an offered plea bargain satisfies the element of deficient performance. (*Id*. at p. 937.) To show prejudice in this context, an appellant must further prove there is a reasonable probability he or she would have accepted the plea bargain but for counsel's subpar representation. (*Ibid*.)

Claims of ineffective assistance of counsel made on direct appeal are disfavored and often unsuitable for review. (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 (*Duff*). ["It is rarely appropriate to resolve an ineffective assistance claim on direct appeal…."]; *People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).) This is particularly true when, as here, elements of the claim cannot be established without further investigation and/or consideration of evidence outside the record. (*People v. Williams* (2013) 56 Cal.4th 630, 691.) The appropriate avenue for relief is a petition for writ of habeas corpus. (*Id*. at pp. 690-691, 693.)

The record before us contains no explanations by attorneys Wong or Dulce of what they did or did not do during the relevant time period. Mr. Pacheco's measured statements to the trial court on April 19, 2012 avoided the issue of his own performance on January 13, 2011, when the prosecution's original offer had apparently not yet expired. Palofox never presented his side of the story, and does not explain how he remained unaware of the time-sensitive nature of the plea offer when he was present in court during both the December 3, 2010 and January 13, 2011 hearings.[3] We cannot

---

[3] We note Palofox filed a notice of appeal with an attachment containing a handwritten message which reads: "I would really like to appeal on the fact that due to

11.

simply take it on faith that he received deficient performance and was prejudiced. The ineffective assistance claim fails for lack of affirmative proof of these elements.

## II. *Wheeler/Batson* Motion

Leon alleges error in the prosecution's use of a peremptory challenge to excuse an African-American prospective juror. The issue was raised below by Centeno's trial counsel, who made an objection pursuant to the holdings of *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*). The other defense attorneys joined in the objection, and Leon's counsel unsuccessfully moved to remedy the alleged error. Centeno, Palofox, and Rivas now summarily join in Leon's arguments on appeal. We find no error.

Background

Jury selection began with a venire of 18 prospective jurors whose racial and ethnic backgrounds are, for the most part, indiscernible from the record. Two members of the original panel were excused by the trial court during its initial round of questioning and replaced by other people in the jury pool. Peremptory challenges were made after further questioning by the prosecution and each of the four defense attorneys, which resulted in the removal of seven panel members, each of whom was replaced by a new prospective juror. The reconstituted panel included Prospective Juror No. 23, hereafter referred to as "Juror 23."

Juror 23 is described in the record as an African-American male. His oral voir dire responses disclosed a four-year career as a military police officer and an educational background that included one year of law school. When asked by the trial court if his legal education might impact his ability to remain impartial, he replied, "No. Actually, the reason I stayed is I keep thinking I would – if I was in [the defendants'] shoes I would

the fact I was not properly addressed with a deal that I would have [benefitted] from, due to the fact I was not being represented [by] an attorney!"

12.

want somebody on me because I've got all the reasons in the world to get out of this. But, you know, I could be fair." Leon's trial counsel sought to clarify the meaning of this answer by asking, "I think you said earlier if – these gentlemen who are on trial here would probably want you as a member of their jury. Now, I'm going to ask you to correct me if I'm wrong, but – well, do you mean by that that you are going to bend over backwards to favor them?" Juror 23 responded, "No, just be fair. That's all anybody would want is somebody to be fair."

The other defense attorneys questioned Juror 23 about a variety of topics including his views on a defendant's decision not to testify, the reliability of eyewitness testimony, the reliability of confessions made by suspects to police, and the prosecution's burden of proof. He indicated that a defendant's decision not to testify would have no impact on his verdict. Regarding eyewitness accounts, he said, "I believe that the eyewitness believes what they see … but whether that's the whole truth of the matter, I'd be able to examine all the evidence to make a determination." He agreed with the proposition that a suspect could be tricked into confessing to something they did not actually do. When asked for his thoughts on the prosecution having the sole burden of proof, he replied, "I love it."

After defense counsel had asked their questions, the prosecution made two inquiries of Juror 23. The first called for a yes or no answer regarding whether, if necessary, he could bring himself to find a defendant guilty of a crime. He replied, "Won't be – that won't be my problem." The prosecutor then said, "Okay. Um, if the evidence proves the defendants are guilty, can you come back with a verdict that says 'I find you guilty?'" His response was, "Yes, I can." The prosecution passed on its next opportunity to exercise a peremptory challenge, and thereafter elected to remove Juror 23 from the panel.

The defense objected to the prosecution's challenge on grounds that Juror 23 "seemed as down the line and fair as it could get," was "a person of a particular protected

13.

class," and was allegedly one of only two African-American members of the prospective juror panel. The *Wheeler/Batson* motion prompted the following exchange between the prosecutor and the trial court:

Trial Court: [L]et me just ask, first of all, from your point of view, has the prima facie showing been made? And do you want to be heard with respect to [Centeno's attorney's] representation about the racial composite of the prospective jurors?

Prosecutor: Sure.

Trial Court: Composition, I should say.

Prosecutor: Yes. As I currently have seen, there's three – there were three potential jurors in the box that appeared to be African-American. One is [Prospective Juror No. 10]. The other is [Prospective Juror No. 30], both of which are still on the panel. The prosecution has passed as to those two jurors. Um, as to [Juror] 23, the prosecution, even though I don't feel a prima facie case has been shown in any regard, I'll still offer my reasons.

Trial Court: Good. Go ahead.

Prosecutor: The reason why the prosecution thanked and excused him is for two reasons. One, he said he had completed a year of law school, and I'm suspicious of people with a little limited amount of legal training being left on the jury. Secondly, he volunteered that if he were in their shoes, and he looked over towards the defendants, he would want someone like himself on the jury. Now, I understand he rehabilitated himself in his answers, but that still goes a long way towards what I believe his initial state of mind was.

Next, the trial court addressed the defense attorneys: "Without having concluded, as the People have allowed, that there is a prima facie showing here, um, why isn't that a legitimate reason, the very last thing you heard [the prosecutor] say?" Centeno's attorney submitted, without further explanation, that he believed the prosecutor's challenge was racially motivated. Rivas's lawyer opined that Juror 23's voir dire responses were indicative of fairness and impartiality. Leon's trial counsel said, "I think there are a number of people who have told us they had a little bit of legal training that [the

14.

prosecution] has passed on. I'm just looking at his sheet; that would include [Prospective Juror No. 5]. But a number of people know attorneys or have taken a certain amount of legal education. And [the prosecution] passed on those. And I think that [Juror] 23 was rehabilitated in response to – I mean I think that [he] was rehabilitated – was sufficiently rehabilitated." Counsel for Palofox joined in the argument regarding "rehabilitation." After considering the parties' arguments, the trial court ruled as follows:

> I guess all of you are [using the term] rehabilitated – this isn't a challenge for cause. The fundamental issue before the court is if there's a prima facie showing that this was a race-based challenge. [The People have conceded] that there is some possible construct of the circumstances [that] might allow for that conclusion. Although it's the court's view that – that there is at least one other African-American remaining on the jury on which the People have passed.

> Nevertheless, accepting that this – some court might conclude that there has been a prima facie showing, its seems to me that the issue before this court now is whether there is a neutral ground for – non race-based ground for the prosecution to have exercised that peremptory challenge. And the court is not entitled to reweigh that judgment, no more than the court's entitled to weigh [] your judgments about the exercise of peremptory challenges. The only real question before the court is whether the court is to disbelieve [] the People's grounds and find there really isn't any basis in the record here to support the People's purported grounds for exercising that peremptory challenge.

> I think under the circumstances there is sufficient demonstration to the court's satisfaction that there are neutral grounds for the exercise of [the] peremptory challenge. So I'm denying the motion with respect to *Wheeler*. And that's why I, frankly, after everything I heard I did not suggest to [Juror] 23 that he should have a seat here in case that the defense might be seeking to reseat him as opposed to starting the whole panel over. But nevertheless the motion is denied.

Analysis

State and federal law prohibits the use of peremptory challenges to strike prospective jurors on the basis of race or ethnicity. (*People v. Avila* (2006) 38 Cal.4th 491, 541, citing *Batson*, *supra*, 476 U.S. at p. 88; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.) A three-step procedure is used to evaluate allegations of such discrimination. "First, the defendant must make out a prima facie case 'by showing that the totality of the

15.

relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide … whether the opponent of the strike has proved purposeful racial discrimination.'" (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.)

The parties disagree about whether the existence of a prima facie case of discrimination is reviewable since the trial judge considered arguments pertaining to the third stage of the *Wheeler/Batson* analysis. The rule is that "[w]hen a trial court solicits an explanation of the strike without first declaring its views on the first stage, we infer an 'implied prima facie finding' of discrimination and proceed directly to review of the ultimate question of purposeful discrimination." (*People v. Scott* (2015) 61 Cal.4th 363, 387, fn. 1.) Here, the trial court's equivocal assessment of the threshold question likely resulted in an implied prima facie finding. We thus focus on the third stage of the analysis, where "'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.'" (*People v. Lenix* (2008) 44 Cal.4th 602, 613 (*Lenix*), quoting *Miller-El v. Cockrell* (2003) 537 U.S. 322, 339.)

Our review of the trial court's ruling examines "only whether substantial evidence supports its conclusions." (*Lenix, supra,* 44 Cal.4th at p. 613.) We presume the prosecution used its peremptory challenges in a lawful manner and accord "great deference to the trial court's ability to distinguish bona fide reasons from sham excuses." (*People v. Burgener* (2003) 29 Cal.4th 833, 864.) "So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." (*Ibid.*)

The prosecution's stated reasons for challenging Juror 23 were (1) an aversion to jurors who possess a "limited amount of legal training" and (2) suspicion of the prospective juror's bias in favor of the defense. Attorneys have the right to strike a

16.

prospective juror "based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons." (*Lenix*, *supra*, 44 Cal.4th at p. 613.) Likewise, "the law recognizes that a peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror partiality. The evidence may range from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative." (*Wheeler*, *supra*, 22 Cal.3d at p. 275.) Under these well-established principles, the prosecution offered permissible, race-neutral grounds for exercising its peremptory challenge.

Leon's trial counsel insinuated that the first explanation was pretextual because the prosecution had supposedly passed on several people who had "a little bit of legal training," including Prospective Juror No. 5. The record does not support this contention. Although Prospective Juror No. 5 said that his *father* was a civil defense attorney, he himself was a community college student who had plans to matriculate to the Academy of Art University in San Francisco. When asked about a basic legal concept, this prospective juror claimed ignorance of the prosecution's burden of proof in a criminal trial.

At the time of the *Wheeler*/*Batson* motion, three other panel members had referenced educational backgrounds that were tangentially related to the field of law. Prospective Jurors Nos. 11 and 13 studied criminology at the undergraduate level. The latter individual was excused by the trial court and the former was stricken by the defense during the first round of peremptory challenges. Prospective Juror No. 30 was pursuing a degree in criminal justice. This panel member was also African-American and ultimately served on the jury.

Leon points out that no challenges were made against Alternate Juror No. 45, who was added to the panel after the denial of the *Wheeler*/*Batson* motion, despite that juror's career as a workers' compensation attorney. This fact is of questionable relevance since the prosecution was allegedly concerned about people with a "limited amount of legal

17.

training," not licensed professionals who had obtained a J.D. and been admitted to the state bar. To the extent the record allows for a comparative juror analysis, such analysis does not support appellants' claim of racial discrimination. (See *Lenix*, *supra*, 44 Cal.4th at p. 607 ["Comparative juror analysis is evidence that, while subject to inherent limitations, must be considered when reviewing claims of error at *Wheeler*/*Batson*'s third stage when the defendant relies on such evidence and the record is adequate to permit the comparisons."].)

The prosecutor's explanation regarding a suspicion of Juror 23's bias towards the defense was not without evidentiary support. Juror 23 provided a number of ambiguous and unusual answers to questions designed to gauge his impartiality, including the response of "I love it," when asked about the prosecution's burden of proof. He was also the only person to speak up when defense counsel asked the panel if any of them believed law enforcement officers might lie when giving testimony; he said, "I believe that." Although Leon insists Juror 23 was an ideal candidate for jury service, the moving party's favorable opinion of a challenged panelist is not proof that a prosecutor's race-neutral justifications are pretextual. (See *People v. Hensley* (2014) 59 Cal.4th 788, 803 ["The fact that the *objector* thinks his opponent should feel comfortable with the candidate is not the relevant question. The question is whether the advocate *exercising the challenge* had an honest and racially neutral reason for doing so."].) Given the plausibility of the prosecutor's explanations, we must defer to the trial court's assessment of their genuineness. (*People v. Silva* (2001) 25 Cal.4th 345, 385-386.)

It is also significant that the prosecution made no attempt to challenge Prospective Juror No. 30, who was reportedly of the same race as Juror 23. "Although not conclusive, the fact that the jury included a member of the group allegedly discriminated against 'is an indication of good faith in exercising peremptories.'" (*People v. Johnson* (2015) 61 Cal.4th 734, 760.) This consideration, combined with the factual circumstances discussed above, leads us to conclude the challenged ruling is supported

by substantial evidence. Therefore, we will not reverse the trial court's denial of the *Wheeler/Batson* motion.

## III. Admissibility of Leon's Custodial Statements to Police

Leon made incriminating statements during a recorded interview with law enforcement officials on the day of his arrest. A partial audio recording of that interview was played for the jury during the prosecution's case-in-chief. Although the admissibility of Leon's confession was not contested at trial, he now asserts that his statements were induced by implied promises of leniency. To circumvent forfeiture of this argument, he alleges ineffective assistance of counsel based on his trial attorney's failure to dispute the voluntariness of his statements. The claim fails under the applicable standard of review.

Forfeiture

"Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was 'timely made and so stated as to make clear the specific ground of the objection.'" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20.) This code section operates as a rule of forfeiture (*People v. Nelson* (2011) 51 Cal.4th 198, 223), even in the context of a constitutional challenge to the voluntariness of a defendant's confession (*People v. Tully* (2012) 54 Cal.4th 952, 979-980, 983, fn.10 (*Tully*); *People v. Williams* (2010) 49 Cal.4th 405, 435 (*Williams*).) Leon's failure to dispute the voluntariness of his confession at trial makes appellate review impractical because "the parties had no incentive to fully litigate this theory below, and the trial court had no opportunity to resolve material factual disputes and make necessary factual findings." (*People v. Ray* (1996) 13 Cal.4th 313, 339.) "Under such circumstances, a claim of involuntariness generally will not be addressed for the first time on appeal." (*Ibid.*) For these reasons, Leon's direct challenge to the admissibility of his confession has been forfeited.

19.

Ineffective Assistance of Counsel

1. Background

Leon and his brother, Eric Rodriguez, were arrested together at their home in Arizona. They were transported to a local police station in a vehicle equipped with a hidden recording device which allowed investigators to hear their conversations with each other. Leon told Eric something to the effect of, "Don't say anything, [just] tell them we went to the beach in California." When they arrived at police headquarters, the brothers were separated and interrogated. Eric was later brought into Leon's interview room for joint questioning.

After waiving his right to remain silent, Leon responded to questioning by Detectives John Willow of the Clovis Police Department, Jon Sims of the Fresno County Sheriff's Office, and Dwayne Pavelski of the Merced County Sheriff's Department. He acknowledged taking a road trip to California with a group of people on unspecified dates, but said that he could not recall any locations he had visited except for a beach town that began with a "V," possibly Venice Beach. He feigned ignorance as to why he was being questioned until the detectives told him they were investigating a "crime spree" and claimed to "have eyewitnesses that put [him] inside the locations." Leon reacted by saying, "That put me inside? … You got fingerprints though or what? You got proof that I was in there… [?]" After the detectives assured him they had ample evidence of his involvement, Leon admitted to participating in the subject events.

Leon's initial admissions were vague. For example, when asked why the group had targeted the home in Clovis, he responded, "I didn't see no house, I was just right there … I didn't – I'm telling you right now, I didn't beat nobody down, I didn't do nothing like that." He portrayed himself as a peripheral participant in the conspiracy and denied being at three of the five crime scenes. When the detectives pressed him for details about each incident, he told them, "Honestly, I wanna say like, I didn't leave all the time, I'm just saying like that one time is when I went and then that one time I was [a]

20.

lookout, that's about it." He made denials regarding the use of a firearm, but eventually admitted to having a gun in his hand during one of the robberies. By the end of the interview Leon had confessed to being inside of the two homes that were robbed on March 16, 2010. He and his brother denied having any involvement in the incident that occurred at night (i.e., the robbery in Atwater on February 24, 2010).

On appeal, Leon claims his trial counsel should have realized the investigators made promises of leniency in exchange for admissions of guilt. He cites first to a comment by Detective Sims during the early stages of the interview: "[W]e're here to help you so that we can kind of work as an advocate for the – for you on behalf of the [District Attorney], 'cause the DA wants to, you know, you've got this, this, this, this, this, this. Okay, this case, this case, this case, this case. They've laid it out." As the interview progressed, Detective Sims continued to tell Leon that he wanted to "help" him. In the midst of Leon's denials regarding the use of a gun, the detective said, "Okay, look at me, look at me right in the eyes dude … I need to know this, it's for you… It's not for me, it's for you… help me help you."

Leon also complains of being tricked into believing that expressing remorse would engender some form of prosecutorial leniency. Detective Sims urged him to make a written confession and apology, and said that he would deliver the apology to the district attorney. Later, a deputy district attorney from Fresno County named Greg Anderson came into the room and spoke with Leon. The extent of their conversation is unclear from the record, but the following statements were made concerning the alleged significance of Leon's remorse:

Anderson: You know, if you have remorse in this case, if you feel remorse for what you did, okay, let me know, 'cause that makes a difference. Okay, there are victims in this case, and they've gone through a lot in this case, um, I know that a number of people in this case have written letters of apology.

Leon: Yeah.

Anderson: I think that's a great idea.

Leon: Yeah. It's cause, like – I mean like, I wasn't planning to do this, I mean like, I was just like, I was like, I went with them, they're like 'hey, we're gonna do this' – so I was just like –

Anderson: Yeah, you got caught up in it, you got caught up in the robberies, the next thing you know it's happening.

Leon: Yeah, yeah.

Anderson: If you feel bad about that, this is the time to write that letter, okay? Because that's what's gonna tell the judge and the jury and the people that you feel bad about it. Okay? And that's – that's not a bad thing, that means you have a conscience. Alright? Which is a good thing.

Following his statements about remorse, Mr. Anderson made the following remarks: "I may want you to talk to your brother. 'Cause your brother ain't seeing the light. Okay? For some reason when you guys initially had that talk – ok, he's like no I never was there. Nothing ever happened and everything… and the problem is he's the only one who is doing that. So if anyone is going down it's him which is kinda sad." (Original ellipsis.) Leon urges us to interpret the last statement as "implying that confessing meant *not going down*." (Original italics.)

2. Analysis

We have already explained that an appellant must establish two things in order to prevail on an ineffective assistance of counsel claim: (1) the performance of his or her attorney fell below an objective standard of reasonableness and (2) prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *People v. Anderson* (2001) 25 Cal.4th 543, 569.) Leon's briefs gloss over the first prong of the analysis, but we are inclined to agree with respondent that the required showing has not been made. In any event, the claim fails due to Leon's inability to establish prejudice.

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within

the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Mai, supra,* 57 Cal.4th at p. 1009.) "All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)

Leon's arguments speak to the disputed existence of a factual and legal basis for moving to suppress his custodial statements. "There may be cases, however, where for tactical reasons counsel foregoes [sic] making a motion [to suppress] even though the motion has merit." (*People v. Gonzalez* (1998) 64 Cal.App.4th 432, 437, fn. 1 (*Gonzalez*).) On the one hand, a defendant's own confession is generally considered to be the most probative and damaging evidence that can be admitted against him. (*Skilling v. United States* (2010) 561 U.S. 358, 383.) On the other hand, Leon's interview contained numerous denials and mitigating statements. Respondent argues that independent evidence of Leon's participation in the robberies was strong enough to justify a strategic decision to allow his interview statements to come into evidence. In other words, defense counsel may have perceived a legitimate benefit in allowing the jury to hear Leon deny and/or minimize his role in most of the crimes without having to subject him to cross-examination on the witness stand. (See *People v. Kelly* (1992) 1 Cal.4th 495, 521-523 ["Counsel had to make the difficult decision whether on balance the defense would benefit from the jury hearing the tape of defendant's confession as part of the prosecution case-in-chief at the guilt phase. This is precisely the type of tactical decision defense counsel must be allowed to make without fear of appellate second-guessing…"].]

Respondent supports its position by citing to testimony by the victim of the March 16, 2010 robbery in Atwater, who claimed to be "one hundred percent" certain

that Leon was one of the perpetrators who entered his home. The Attorney General further notes: "Just a few hours after the fifth robbery on McCall Avenue [in Selma], Leon and his green Tahoe were both photographed with a group that included coconspirator Beltran, who later pawned a ring stolen in that robbery. In addition, a cell phone registered to someone with Leon's Arizona home address was in the vicinity of all five robberies, while in frequent contact with phones belonging to codefendant Rivas and coconspirators Landeros and Zazueta." Thus, given the probability of Leon's conviction on the counts relating to the two robberies on March 16, 2010, defense counsel could have reasonably concluded that the exculpatory value of his statements about the other crimes outweighed the damaging impact of his admissions.

Respondent's theory is plausible, especially in light of the jury's verdict. The defense evidence consisted of employment records which ostensibly showed that Leon was in Arizona on February 24, 2010 when the first two robberies were committed. However, eyewitnesses from both of those incidents not only identified him as one of the perpetrators, but also claimed he was the man who viciously attacked an occupant of the house in Atwater. In light of the conflicting evidence, Leon's attorney may have wanted the jury to hear his client's denials in order to bolster his alibi. If this was counsel's strategy, it is entirely possible that Leon benefited from it since the jury acquitted him of all counts arising from the February 24, 2010 robberies.

In his reply brief, Leon counters that the potential consequences of true findings on the gang enhancement allegations negated any strategic benefit of forgoing a motion to suppress the interview statements. To accept this argument, we would have to speculate as to defense counsel's overall assessment of the evidence and his belief in the probability of success at the bifurcated trial on the gang issues. "[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on [direct] appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001)

24.

26 Cal.4th 876, 926.) Leon has not demonstrated that there could be no conceivable reason for his trial attorney's performance in regards to the custodial interview evidence. His claim fails for this reason alone.

Were we to assume Leon could clear the first hurdle of the *Strickland* test, he would still have to show prejudice. "To establish prejudice, however, the defendant must do more than show the motion [his attorney neglected to make] would have been meritorious. When the alleged deficiency is the failure to make a suppression motion, the defendant must show, in addition, the motion would have been successful." (*Gonzalez*, *supra*, 64 Cal.App.4th at p. 438.) Such a showing cannot be made on the present record.

According to Leon, a motion to suppress his interview statements would have succeeded on grounds of involuntariness. "'In general, a confession is considered voluntary "if the accused's decision to speak is entirely 'self-motivated' [citation], i.e., if he freely and voluntarily chooses to speak without 'any form of compulsion or promise of reward. . . .' [Citation.]" [Citation.] However, where a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law.'" (*Tully*, *supra*, 54 Cal.4th at pp. 985-986.) Leon's argument thus raises two distinct questions: were there any promises of leniency, and if so, were they the "motivating cause" of his decision to admit guilt? (*People v. Linton* (2013) 56 Cal.4th 1146, 1176 (*Linton*); *Tully*, *supra*, 54 Cal.4th at p. 986.) To answer these questions we must evaluate the totality of the circumstances, keeping in mind that the prosecution need only prove voluntariness by a preponderance of the evidence. (*Tully*, at pp. 986, 993.)

We consider first Detective Sims's stated intention to act as an "advocate" for Leon and to "help" him. Such use of the term "help" does not necessarily constitute an implied promise of leniency. (*People v. Vance* (2010) 188 Cal.App.4th 1182, 1212 [no implied promise of leniency in detective saying "[w]e are here to listen and then to help

25.

you out."].)  Detective Sims may have pushed the envelope by calling himself an advocate, but the vagueness of his statements and lack of any specified terms of quid pro quo weigh against a finding of an improper promise.  (See *People v. Jones* (1998) 17 Cal.4th 279, 297-298 ["the detective's offers of intercession with the district attorney amounted to truthful implications that his cooperation might be useful in later plea bargain negotiations"]; *People v. Higareda* (1994) 24 Cal.App.4th 1399, 1409 [investigating officer promised nothing more than to speak with the prosecutor if defendant was truthful]; cf. *People v. Cahill* (1994) 22 Cal.App.4th 296, 314 (*Cahill*) [implied promises of leniency found where detectives claimed they were trying to help the defendant and represented that he could avoid a first degree murder conviction by admitting guilt and denying premeditation].)

There is, of course, a fine line "between urging a suspect to tell the truth by factually outlining the benefits that may flow from confessing, which is permissible, and impliedly promising lenient treatment in exchange for a confession, which is not." (*People v. Holloway* (2004) 33 Cal.4th 96, 117 (*Holloway*).)  Detective Sims and deputy district attorney Greg Anderson both treaded close to this line by emphasizing the supposed importance of Leon's willingness to show remorse.  However, the California Supreme Court has said "there is nothing improper in pointing out that a jury probably will be more favorably impressed by a confession and a show of remorse than by demonstrably false denials." (*Williams, supra,* 49 Cal.4th at p. 444.)  The interrogators did not phrase their statements exactly in this way, but they arguably refrained from implying anything more than the benefits that flow naturally from a truthful and honest course of conduct.  (See *Holloway*, *supra*, 33 Cal.4th at p. 116; *People v. Andersen* (1980) 101 Cal.App.3d 563, 579 ["statements of police officers to the effect that a showing of remorse is a factor which mitigates punishment" are not improper].)

As for the remark about Leon's brother being the only one "going down," the statement must be read in context.  (See *People v. Carrington* (2009) 47 Cal.4th 145, 170

26.

(*Carrington*).) It does not appear Mr. Anderson was attempting to elicit further admissions from Leon. He was most likely trying to increase the chances that Leon's brother would also provide incriminating statements. We do not interpret the ambiguous comment as implying a benefit to Leon in exchange for Leon's own admissions.

To the extent any of the challenged statements can be construed as improper promises, Leon has not established the element of causation. This is due in part to his failure to provide an adequate record, which is admittedly a consequence of the issue never being litigated at trial (and underscores why the claim should have been raised, if at all, by way of a habeas corpus petition). He presents us with two alternate transcripts of his interview, but both are redacted and show gaps of unknown length between various questions and answers. Each version contains material not present in the other, with some statements being cut off in mid-sentence. We cannot conduct a proper analysis without knowing facts such as the amount of time that elapsed between the alleged promises of leniency and Leon's statements of admission, and whether intervening questions or discussions may have had a causal effect on his decision to reveal certain information.

Notwithstanding the incomplete record, we are unconvinced that the alleged promises of leniency were the motivating cause of Leon's admissions. He seems instead to have been affected by the extent of the investigators' knowledge of the crimes and a desire to separate himself from those whose involvement in the conspiracy was allegedly more extensive and egregious than his own. Accordingly, and for the reasons explained above, the claim must be rejected.

### IV. Admissibility of Centeno's Custodial Statements to Police

Centeno also disputes the voluntariness of a confession he made to law enforcement officers during a custodial interview. Like Leon, he argues his incriminating statements were induced by promises of leniency. The parties seem to agree that the issue was not preserved for appellate review. The claim is therefore characterized as one

of ineffective assistance of counsel. Based on the limited evidence in the record, Centeno cannot satisfy his burden of demonstrating a causal connection between the alleged promises of leniency and his admissions of guilt. We are thus constrained to uphold the judgment regardless of whether any improper promises were made during his interrogation.

Background

Centeno was interrogated at a juvenile detention facility in Arizona. According to his probation report, he was being held at the facility on unrelated charges when detectives spoke with him about the events in this case. His age at the time of the interrogation was approximately 17 years and 5 months.

Our knowledge of what occurred during the custodial interview is limited to the contents of a 20-page transcript containing portions of the questioning, but the transcript has been redacted to an unknown degree. The length of the interview is also unknown. The entire session was reportedly documented in an audio recording, but we have only heard a 29-minute excerpt that was played for the jury, which corresponds to a slightly different and shorter transcript used at trial.[4]

The material in the record begins during a question and answer session between Centeno and Detective Alexander Archuleta of the Phoenix Police Department, then seemingly cuts to Detective Dwayne Pavelski advising the suspect of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*)). After Centeno confirms his understanding of the *Miranda* advisement, Detective Pavelski transitions into series of narratives which include anecdotes from his own life, commentary about the criminal

---

[4] Neither Leon nor Centeno designated the partial audio recordings of their police interviews for inclusion in the record on appeal. Those items, respectively marked as People's Exhibits Nos. 621 and 623, were transmitted at our request. (Cal. Rules of Court, rules 8.224(d) [transmission of exhibits] and 8.320(e) [exhibits admitted in evidence are deemed part of the record in a criminal appeal].)

justice system, and contentions regarding the importance of a forthright confession. His lengthy statements are separated by Centeno's occasional responses of "Mm-hmm" and "Yeah." In the edited audio recording, approximately 14 minutes of such exchanges precede Centeno's disclosure of information about the conspiracy and acknowledgment of his role in two of the robberies.

Centeno claims Detective Pavelski promised him leniency in exchange for admissions by saying things like, "I'm the guy that steps in and actually works to defend you, in a way…" and "I need your side of the story so I can speak for you." Centeno further objects to certain misrepresentations about the legal consequences of his actions. These arguments are based on the following excerpts:

> Pavelski: […] I believe in getting the truth, because if you shut down and tell me, 'I'm not saying nothing to you,' that means I can't get up and speak for you and say, 'this, no – this is what actually happened.' Because I can prove everything.
>
> Centeno: Yeah.
>
> Pavelski: They've already done it. That's why I'm here now. My job is to get up and say, 'look, Victor did take part in something, he fucked up,' I'm not gonna say that in court, but –
>
> Centeno: Say I messed up.
>
> Pavelski: Yeah. I'm gonna say, you know, he – he made a bad decision because he's a juvenile for one, but this is what actually happened, he was, he shows that he can be rehabilitated because he was honest and he actually told the truth about everything that happened. He was sorry for what he did. He was influenced by his friends or something like that. […] Um, and, you know, it comes to mind, do you even realize, has anybody ever told you why juveniles are separated from adults? Why you go to a different jail?
>
> Centeno: Nah.
>
> Pavelski: It's not just because you're under eighteen. That's just a formality. The real-

Centeno:     Probably influenced by them.

Pavelski:    Not even that.  It's because the state of Arizona, actually, it's every state in the United States, believes that a minor can be reabil – rehabilitated.  That's why your guys' sentences for whatever crime is different.  They don't just smack three years on you for something.  They – they look at, is he able to be rehabilitated, and then they base your sentence on your personality, what it is you did, how you cooperated with cops, how you talk, how you present yourself, and that kinda deal.  And then they go, okay, does this guy need probation or does he need some jail time, and while he's in jail, he'll probably have to do these classes, all that kinda stuff.

Centeno:     Mm-hmm.

Pavelski:    Because they want to see that you are able to be reab – rehabilitated so they can put you in society and you're gonna be productive and lead a good life at some point. […]
So, that's why I need your truth, because everybody else has talked.  And I've told everybody the same thing, that I talked to, is, we didn't come from California because we think we – you did it, we came because we know you did it, and that's not even a question, I can see you're agreeing with me by nodding your head.

Centeno:     Yeah.

Pavelski:    Um, my job here is to make sure I get your side of it.  About all of it.  So I know that when things go to court, I'm going 'no, he shouldn't get charged with that,' or the DA's office will go 'no, he shouldn't get charged with that, he shouldn't get charged with that.'  Um, matter of fact, we have a DA that I can talk to, and that will talk to you, when we're done, to let you know, like, okay, hey, this is what's happening, but um, he comes because I come.  Because I'm the one, the guys at work always freaking make fun of me, they think I picked the wrong occupation, I shoulda been a freaking lawyer, but, because I want to be able to present you as the kid that made the mistake that's gonna be rehabilitated, not the kid that is the hardened criminal, that went [unintelligible].

Centeno:     Yeah.

Pavelski    Um, it would benefit you to be as detailed as you could with me, and I also wanna know how you were feeling during all this time. […]

30.

On the eighth day of trial, Centeno's attorney, Linden Lindahl, requested a hearing pursuant to Evidence Code section 402 to determine the validity of his client's *Miranda* waiver. Before the hearing started, the trial court said, "Counsel, just to clarify here, this is a very limited issue which, although I think to some degree defense has earlier waived, we're going to allow it to be heard in any event having to do with the admissibility of Mr. Centeno's statement, whether he was properly *Mirandized* and his statement was otherwise voluntary. Just that limited subject." The hearing itself consisted of testimony from Detective Pavelski, who was briefly questioned about the *Miranda* advisement. Mr. Lindahl's questions focused on the detective's failure to solicit an explicit waiver from Centeno after Centeno said that he understood his rights.

At the conclusion of Detective Pavelski's testimony, Mr. Lindahl argued: "Your Honor, I would submit that this was not a full and complete *Miranda* advisement in that after reading the minor at that time his rights, they launched into an interrogation without asking him whether he wished to exercise his rights. I feel a combination of the detective's presence and his youthfulness, it's my position that [his] will was overborne and he wasn't fully advised. I'd ask his statement be excluded as a *Miranda* violation." The prosecution argued that an implied waiver had been made. The trial court ruled as follows: "Under the circumstances, I'm satisfied that the preponderance of the evidence demonstrated that the defendant was advised of his rights and understood them and answered questions voluntarily. And that, therefore, the statements [are] otherwise admissible in the People's case-in-chief if they seek to use [them]. That's subject, of course, to the redactions that I think the two of you have already agreed to."

Forfeiture

When challenged, a *Miranda* waiver must be "shown by a preponderance of the evidence to be voluntary, knowing and intelligent under the totality of the circumstances surrounding the interrogation. [Citations.] The waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion,

31.

or deception' [citation], and knowing in the sense that it was 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219.) Here, the parties' arguments and the trial court's analysis focused on the knowing and intelligent nature of the *Miranda* waiver. To the extent the trial court evaluated voluntariness, it did so exclusively in regards to the motivation behind Centeno's initial waiver of his right to remain silent, and without consideration of any interrogation tactics employed thereafter.

A claim of erroneously admitted evidence is cognizable on appeal only if the original challenge to the evidence was timely and specific. (Evid. Code, § 353, subd. (a); *People v. Abel* (2012) 53 Cal.4th 891, 924 [review of trial court's admission of evidence is limited to the stated grounds for the objection].) Such challenges must be specific enough to "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*People v. Partida* (2005) 37 Cal.4th 428, 435.) Pursuant to these rules, "[a] defendant ordinarily forfeits elements of a voluntariness claim that were not raised below." (*Williams*, *supra*, 49 Cal.4th at p. 435.)

The trial court was never asked to consider whether Centeno's admissions were influenced by promises of leniency, and does not appear to have reviewed any recordings or transcripts of the interrogation in conjunction with its ruling on the admissibility of his statements. Centeno all but concedes respondent's forfeiture argument, emphasizing that the failure to allege promises of leniency as a ground for suppression is the very reason why his trial attorney's performance was constitutionally deficient. We agree that the issue was forfeited, and will consider the question of voluntariness only within the context of the ineffective assistance claim.[5]

---

[5] In this instance, we are not persuaded by respondent's argument that defense counsel may have "strategically declined to exclude favorable statements" by his client.

32.

<u>Analysis</u>

"The use of deceptive statements during an investigation does not invalidate a confession as involuntary unless the deception is the type likely to procure an untrue statement." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1088.) However, misrepresentations that involve promises of leniency are prohibited. (*Cahill*, *supra*, 22 Cal.App.4th at p. 315.) Detective Pavelski obviously lied to Centeno about being tried as a juvenile and receiving more lenient treatment than an adult could expect under the same circumstances. Centeno makes a compelling argument that these tactics were improper, especially when combined with the detective's insinuation that he had the ability to influence certain aspects of the case.

The challenged comments are fairly interpreted as implying that Detective Pavelski could play a role in deciding what charges would be filed against Centeno. (Cf. *Carrington*, *supra*, 47 Cal.4th at p. 174 ["The interviewing officers did not suggest they could influence the decisions of the district attorney, but simply informed defendant that full cooperation might be beneficial in an unspecified way."].) The other implication was that Centeno's punishment would be dependent upon his cooperation with police. The repeated emphasis on "rehabilitation" suggested his sentence would be less harsh if a judge found him capable of being rehabilitated, and the clear message was that the likelihood of such a finding would increase if he confessed (in which case the detective would advocate for leniency on his behalf) and decrease if he did not confess.

Despite the strength of Centeno's argument regarding promises of leniency, we are unable to conclude that a suppression motion on grounds of involuntariness would have been successful. The viability of such a motion would have hinged on the element of

---

The proposition is illogical given the defense attorney's effort to suppress the statements on other grounds. Furthermore, unlike Leon, Centeno was not identified by any of the victims. The prosecution's case against Centeno was entirely circumstantial save for the evidence of his admissions during the custodial interview.

causation, i.e., whether an improper promise was the motivating cause of his decision to confess, and no single factor is dispositive of that issue. (*People v. Williams* (1997) 16 Cal.4th 635, 661 [rejecting the view that an offer of leniency necessarily renders a statement involuntary].) The ultimate question is "'whether the defendant's "will was overborne at the time he confessed."'" (*People v. McWhorter* (2009) 47 Cal.4th 318, 346-347 (*McWhorter*).) To answer this question, we would need to evaluate "the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226 (*Schneckloth*); accord, *Linton*, *supra*, 56 Cal.4th at p. 1176.) Due to the state of the record, we do not know the totality of the relevant circumstances.

The voluntariness of a confession is subject to independent review on direct appeal if the relevant facts have been "actually and reliably determined." (*Jackson v. Denno* (1964) 378 U.S. 368, 380; see *People v. Bacon* (2010) 50 Cal.4th 1082, 1105 ["we independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally obtained."].) Ordinarily, the facts surrounding a defendant's confession are considered undisputed if the interrogation was memorialized in an audio or video recording, and it is the undisputed nature of the facts that makes de novo review possible in that scenario. (*Duff*, *supra*, 58 Cal.4th at p. 551.) However, the recording must be complete or at least substantially reliable in terms of its portrayal of the circumstances that led to the defendant's decision to confess. (See *McWhorter*, *supra*, 47 Cal.4th at pp. 347-348 [trial court properly examined the totality of the circumstances by viewing recording of police interview in its entirety, not "in snippets or parts"].) Because Centeno's claim of ineffective assistance of counsel requires analysis of circumstances that are unknown due to evidentiary gaps in the record, the missing evidence must be construed against him. (See *People v. Lucas* (1995) 12 Cal.4th 415, 443 ["The sparseness of the record on appeal reflects not the merits of defendant's voluntariness claim but the reality that the issue was not fully litigated below

and that the People were not put to their burden of proof…. Defendant fails to recognize that the silence of the record works against him…"]; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 ["'All intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown.'"].)

Under the totality of the circumstances test, relevant "characteristics of the accused" include the defendant's age, maturity, education, intelligence, mental health, and physical condition at the time of the interrogation. (*Schneckloth, supra*, 412 U.S. at p. 226; *People v. Boyette* (2002) 29 Cal.4th 381, 411 (*Boyette*.) Centeno's probation report indicates that he was a minor and had only completed the eighth grade. Both of those factors weigh in his favor. On the other hand, he was about seven months away from his eighteenth birthday and had been arrested four times since the age of 16, which suggests a familiarity with law enforcement procedures and the legal system. The brief excerpt of his interview with Detective Archuleta (prior to his exchanges with Detective Pavelski) shows him complaining that police officers searched through his cell phone during a recent arrest and questioning whether the searches were allowed without his permission. On balance, Centeno appears to be at least moderately intelligent and capable of making rational decisions for himself.

Relevant "details of the interrogation" include evidence of the location, length, and continuity of the interview, the nature of the questioning (such as aggressive, repeated, or prolonged questioning), the use of physical force or deprivation of food or sleep, and the lack of advice as to the defendant's constitutional rights. (*Schneckloth, supra*, 412 U.S. at p. 226; *Carrington*, *supra*, 47 Cal.4th at p. 175; *Boyette*, *supra*, 29 Cal.4th at p. 411.) The record discloses little in terms of the setting where Centeno's interview occurred or the factors of length and continuity. The tone of the interview seems calm and conversational. As best we can tell, Centeno waived his rights freely and provided incriminating statements without any hesitation. There are no obvious signs

35.

that his will to resist confessing was overborne. To the extent the audio recording provides a reliable timeline, he began to admit guilt within 15 minutes of speaking with Detective Pavelski.

Although promises of leniency are a significant consideration in the overall analysis, we are left with questions regarding the extent to which detectives may have revealed to Centeno what they already knew about the crimes and whether he was motivated by a desire to partially exculpate himself, minimize his involvement, or simply clear his conscience. For example, Detective Pavelski makes casual references to a prior conversation with "Isabelle," who is identified elsewhere in the record as Centeno's girlfriend. We infer from the redacted transcript that Centeno made incriminating statements of remorse to Isabelle, she conveyed some or all of those statements to police, and Centeno was aware of this fact at the time of his interview with Detective Pavelski. Without a complete picture of what occurred during his interview, we cannot conclude that his burden of showing reversible error on the basis of ineffective assistance of counsel has been met. (See *People v. Williams*, *supra*, 56 Cal.4th at p. 691 [concluding appellant's ineffective assistance claims "can be fully addressed only in a habeas corpus petition because they require investigation of evidence outside the record in order to potentially establish prejudice."].)

## V. Sufficiency of the Evidence

Appellants challenge the sufficiency of the evidence underlying their convictions for assault with a semiautomatic firearm as alleged in Count 13 of the indictment. They argue the prosecution failed to establish the semiautomatic characteristics of the weapon(s) used in the offense. Rivas additionally argues that his conviction under Count 4 for attempting to dissuade a witness within the meaning of section 136.1, subdivision (c)(1) lacks evidentiary support. Respondent concedes only the latter argument. We agree with appellants on both issues.

Standard of Review

"To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128.) This analysis is applied to every element of the offense. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 89.) In considering the record as a whole, we "'"must accept logical inferences that the jury might have drawn from the circumstantial evidence.'" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "'A reasonable inference, however, "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work."'" (*People v. Raley* (1992) 2 Cal.4th 870, 891.)

Assault with a Semiautomatic Firearm

Appellants were accused of committing assault with a semiautomatic firearm in violation of section 245, subdivision (b) against Fernando Guzman. Mr. Guzman was victimized during the robbery that occurred in Atwater on the morning of March 16, 2010. We suspect the prosecution elected to charge appellants as it did in light of Mr. Guzman's testimony before the grand jury, during which he claimed to be "experienced with weapons," confirmed his ability to distinguish between "semiautomatic firearms as opposed to revolvers," and testified to being assaulted with a "semiautomatic handgun." His trial testimony, however, did not include those details.

At trial, Mr. Guzman described encountering eight to ten men inside of his home, all of whom were armed with handguns, which he referred to as "pistols." He responded affirmatively when the prosecutor asked if he knew the difference between a pistol and a rifle, but no further explanation of the term "pistol" was asked for or provided. Mr. Guzman thereafter testified to being knocked to the ground, beaten, and tied up during the robbery. An unidentified man had stood over him with a "pistol" while he was

lying on the floor. He watched as the man "cock[ed] back the gun," aimed at his leg, and pulled the trigger. The gun made a "trigger noise" but did not fire.

Section 245, subdivision (a)(2) provides: "Any person who commits an assault upon the person of another with a firearm shall be punished by imprisonment in the state prison for two, three, or four years…." In comparison, section 245, subdivision (b), states: "Any person who commits an assault upon the person of another with a *semiautomatic* firearm shall be punished by imprisonment in the state prison for three, six, or nine years." (Italics added.) The statute does not define "semiautomatic firearm," but our Supreme Court has described the term in other contexts as referring to a gun that "'fires once for each pull on the trigger and reloads automatically, but requires the shooter to release the trigger lever before another shot can be fired.'" (*In re Jorge M*. (2000) 23 Cal.4th 866, 874, fn. 4, quoting Walter, Rifles of the World (2d ed. 1998) p. 498.) This broad definition encompasses most types of modern handguns, and arguably includes revolvers.

The jury below was instructed on the elements of assault with a semiautomatic firearm pursuant to CALCRIM No. 875. The instruction reads, in pertinent part: "A firearm is any device designed to be used as a weapon, from which a projectile is discharged or expelled through a barrel by the force of an explosion or other form of combustion. [¶] A semiautomatic pistol extracts a fired cartridge and chambers a fresh cartridge with each single pull of the trigger."

The drafters of CALCRIM No. 875 took the definition of a "semiautomatic *pistol*" (italics added) from section 17140, which appears in an unrelated part of the Penal Code devoted to the control of deadly weapons. (Judicial Council of Cal., Crim. Jury Instns. (2015) Bench Notes to CALCRIM No. 875, p. 667; see § 16000.) Section 17140 is expressly intended to define "semiautomatic pistol" as that term is used in sections 16900 and 31910. If section 17140 is applicable to section 245, subdivision (b), then the legal definition of a "semiautomatic firearm" is narrowed to exclude revolvers. (See *People v.*

38.

*Dokins* (2015) 241 Cal.App.4th 1179, 1184 ["Unlike semiautomatic weapons, a revolver does not automatically eject the casings as it is fired."].) We question whether the Legislature intended to make such a nuanced distinction, as it would effectively encourage criminals to choose revolvers over of other types of handguns when committing certain crimes.[6] Earlier versions of section 245, subdivision (b) proscribed assault with a "semiautomatic rifle," and the amendment which replaced that term with "semiautomatic firearm" was apparently done to broaden the scope of the statute. (Stats 1993, ch. 369 § 1 (AB 1344) and explanatory notes for same ["substituted 'firearm' for 'rifle' after 'semiautomatic' wherever it appears in subds (b) and (d)(2)"]; Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1344 (1993–1994 Reg. Sess.) Apr. 13, 1993.) We need not resolve this question of statutory interpretation since the prosecution failed to introduce any evidence concerning the mechanical operation of the gun or guns that were used in the Count 13 offense.

The Attorney General argues that Mr. Guzman's use of the word "pistol" provided sufficient evidence to allow the jury to conclude he was assaulted with a semiautomatic firearm under the definition provided in CALCRIM No. 875. She submits that in common parlance, "a 'pistol' is usually, though not always, synonymous with a semiautomatic handgun," and a revolver is generally not considered to be a type of pistol. A number of secondary sources are cited in support of these contentions. Respondent's need to resort to extrinsic authorities only demonstrates that such matters are not of universal common knowledge and experience. If Mr. Guzman understood his use of the word "pistol" to be synonymous with the legal definition of a "semiautomatic firearm" (whatever that may be), it was the prosecution's burden to elicit that information during

---

[6] CALCRIM pattern instructions are the official instructions for use in the criminal courts of this state, but "are not themselves the law, and are not authority to establish legal propositions or precedent. … At most, when they are accurate, … they restate the law." (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7; Cal. Rules of Court, rule 2.1050.)

39.

his testimony. In the absence of such testimony, and without any further evidence of the type of weapon(s) used, the jury had no basis upon which to conclude beyond a reasonable doubt that the victim was assaulted with a semiautomatic firearm.

Respondent also argues that the verdict is supported by circumstantial evidence. A victim of the second robbery committed on February 24, 2010 (which occurred almost three weeks before the assault of Mr. Guzman) testified to seeing an unidentified perpetrator holding a semiautomatic nine-millimeter gun. The victim was able to provide those details because he personally owned the same type of weapon. Elsewhere in the record is testimony from Deputy Robert Woodrum, who offered hearsay statements about his conversation with a non-victim eyewitness who allegedly claimed to have seen Estevan Landeros hand a "silver revolver" to Palofox on one occasion, and also saw Landeros in possession of a semiautomatic gun at a hotel on the night of March 16, 2010.[7] Since Landeros was identified as a participant in both the February 24 and March 16 robberies, respondent infers he likely used a semiautomatic firearm while robbing Mr. Guzman's home. In addition, Palofox was reportedly found in possession of a nine-millimeter "semiautomatic pistol" during a traffic stop conducted in Arizona on March 29, 2010, and police discovered a ".45 caliber semiautomatic Ruger handgun" during a search of his living space in May of that year.

The relationship of the facts relied upon by respondent to the assault on Mr. Guzman are too attenuated to constitute substantial evidence of guilt under section 245, subdivision (b). Even if the necessary inferences could be drawn from those circumstances, the witnesses who made references to "semiautomatic" guns testified in non-expert capacities and offered no insight into their own understanding of that terminology. The jury had no way of knowing if any of the weapons used in any of the

---

[7] Interestingly enough, the eyewitness's trial testimony described the weapon given to Palofox as a silver "pistol." She had no memory of seeing any guns at the referenced hotel.

robberies actually satisfied the definition provided in the CALCRIM No. 875 instruction. Therefore, appellants' convictions for assault with a semiautomatic firearm must be reversed.

Appellants do not otherwise dispute that a firearm was used to assault Mr. Guzman. Assault with an unspecified type of firearm in violation of section 245, subdivision (a)(2) is a lesser included offense of assault with a semiautomatic firearm as proscribed by subdivision (b) of the same code section. (*People v. Martinez* (2012) 208 Cal.App.4th 197, 199.) We therefore agree with the parties that the appropriate remedy is to modify the judgments to reflect convictions under Count 13 for the lesser included offense of assault with a firearm in violation of section 245, subdivision (a)(2). (§ 1260; *People v. Navarro* (2007) 40 Cal.4th 668, 678-679 [an appellate court can modify the judgment to reflect conviction of a lesser included offense if the evidence supports the lesser offense but not the charged crime]; *People v. Howard* (2002) 100 Cal.App.4th 94, 99 [same].) Appellants shall be resentenced accordingly on remand.

Attempting to Dissuade a Witness by Force or Threats

Rivas was charged as a co-conspirator in Count 4 of the indictment as follows: "[C]ommitting the crime of ATTEMPTING TO DISSUADE A WITNESS in violation of Penal Code section 136.1(c)(1), a felony, in the County of Fresno, in that on or about February 24, 2010, [defendants] did knowingly and maliciously by an express or implied threat of force or violence attempt to prevent and dissuade a witness and victim, Darshawn [sic] Walia and Gurmuph Singh[,] from making a report of that victimization to any peace officer or law enforcement agency as authorized by law." (Original capitalization.)

Count 4 pertained to the robbery in Clovis. Because victim Darshan Walia was deceased at the time of trial, the prosecution relied on the testimony of Gurmuph Singh to prove the elements of the offense. Mr. Singh's testimony described his encounter with five armed intruders who ransacked his home in search of "gold and cash." The robbers

41.

were in the house for approximately 30 minutes, during which time they brought him into his living room, made him lie face down on the floor, and tied up his legs with "electrical wires." Mr. Singh also testified that the men "took off all the receivers" from the telephones in the home. When the prosecutor asked for clarification of this testimony, he replied, "They picked up all the receivers so we can't talk to anybody."

Section 136.1 addresses multiple forms of witness intimidation. "Subdivision (a)(1) proscribes knowingly and maliciously preventing or dissuading any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law, and subdivision (a)(2) proscribes attempting to do so." (*People v. Torres* (2011) 198 Cal.App.4th 1131, 1138.) "Subdivision (b) proscribes three other wobblers with the common element of attempting to prevent or dissuade a crime victim or witness from doing any of the following: reporting the victimization to anyone in law enforcement, including a law enforcement officer, a peace officer, probation, parole, or correctional officer, a prosecuting agency, or a judge (subd. (b)(1)); causing a complaint, indictment, information, probation or parole violation to be prosecuted and assisting in the prosecution (subd. (b)(2)); or seeking or causing the arrest or arresting a person in connection with 'that victimization' (subd. (b)(3)). Unlike the subdivision (a) offenses, the subdivision (b) offenses do not expressly include the mental element of knowingly and maliciously." (*Ibid*.)

The provision under which Rivas was found guilty, subdivision (c)(1), provides: "Every person doing any of the acts described in subdivision (a) or (b) knowingly and maliciously under any one or more of the following circumstances, is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years under any of the following circumstances: … Where the act is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person." Rivas argues, and the Attorney

General concedes, that the evidence is insufficient to establish the element of dissuasion by force or threats.

We are willing to accept the Attorney General's position, but are unclear about the extent of the concession. Respondent's brief states, in pertinent part: "Rivas's conviction on count 4 must be reversed for insufficient evidence, and his sentence reduced accordingly." This is followed by a citation to *People v. Bechler* (1998) 61 Cal.App.4th 373, 378-379, which discusses an appellate court's ability to modify judgments to reflect a lesser included offense if such a conviction is supported by the evidence. Whether or not respondent intended to suggest the evidence is sufficient to hold Rivas accountable for committing a lesser included offense of section 136.1, subdivision (c)(1), we have independently reached that conclusion after reviewing the record in the light most favorable to the judgment.

The jury could have reasonably inferred that removal of the receivers from Mr. Singh's telephones was done to prevent him from reporting his victimization to law enforcement for purposes of section 136.1, subdivision (b)(1). (See *People v. McElroy* (2005) 126 Cal.App.4th 874, 878, 882 [elements of subdivision (b)(1) satisfied by defendant's unplugging of victim's home telephone to prevent her from using it].) Unlike subdivisions (a) and (c) of the statute, subdivision (b)(1) does not require the predicate act to be committed "knowingly and maliciously" or to be accompanied by force or threats. It is enough to show the defendant attempted to "prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from … [m]aking any report of that victimization to any peace officer or state or local law enforcement officer…." (§ 136.1, subd. (b)(1).)

Rivas contends that "[a]t most, the evidence showed the men inside the house disconnected the phones in order to delay any efforts to contact police, not to prevent them from reporting the crime altogether." He cites no authority for reading such temporal distinctions into the statute, and we are not persuaded by his argument. The

43.

only remaining question is whether his violation of section 136.1, subdivision (b)(1) constituted a lesser included offense of the crime for which he was convicted.

"Two tests have traditionally been applied in determining whether an uncharged offense is necessarily included within a charged offense – the statutory or legal 'elements' test and the 'accusatory pleading' test. (*People v. Sloan* (2007) 42 Cal.4th 110, 117 (*Sloan*), italics omitted.) The elements test asks whether the statutory elements of the greater offense include all of the statutory elements of the lesser offense. (*Ibid.*) Put differently, "'where an offense cannot be committed without necessarily committing another offense, the latter is a necessarily included offense.'" (*People v. Pearson* (1986) 42 Cal.3d 351, 355.) Under the accusatory pleading test, an uncharged offense is included within the charged offense if the facts alleged in the accusatory pleading include all of the elements of the uncharged crime. (*Sloan*, s*upra*, 42 Cal.4th at p. 117.)

Under the elements test, a violation of section 136.1, subdivision (b)(1) is necessarily included within the offenses set forth in section 136.1, subdivision (c). (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1321.) The accusatory pleadings test shows that the factual allegations in Count 4 encompassed every element of subdivision (b)(1), and thus provided Rivas with adequate notice of his potential liability for this lesser included offense. Therefore, we find it appropriate to modify the judgment to reflect a conviction under Count 4 for attempting to prevent a victim or witness from reporting a crime in violation of section 136.1, subdivision (b)(1). Rivas is to be resentenced accordingly on remand. Since the lesser included offense is a "wobbler," the trial court will have discretion to treat the conviction as either a felony or a misdemeanor. (§ 17, subd. (b); *People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 974, 977.)

## VI. Gang Findings

A bifurcated jury trial was conducted as to the gang-related allegations in Counts 9, 11, and 16. Each of those counts involved the substantive offense of robbery committed within an inhabited dwelling house and in concert with two or more other

persons (§§ 211, 213, subd. (a)(1)(A)). The gang allegations were made pursuant to section 186.22, subdivision (b), which provides for increased punishment when an offense is committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Id.*, subd. (b)(1) and (4).) The jury's findings ultimately determined whether appellants received life sentences (Centeno, Leon, and Palofox) or a sentence for a term of years (Rivas).[8]

The prosecution argued that appellants knowingly committed the underlying offenses in association with members of a criminal street gang, and were therefore liable under section 186.22, subdivision (b) regardless of their personal gang affiliations or lack thereof. To support this theory, evidence was presented regarding admissions made by certain individuals during jail classification interviews that followed their arrest for the subject robberies, including those of third party accomplices/co-conspirators Gilbert

---

[8] Most felonies committed for the benefit of, at the direction of, or in association with a criminal street gang are subject to the enhancement of an additional prison term ranging from two to ten years. (§ 186.22, subd. (b)(1)(A)-(C).) However, if the gang-related crime is a "home invasion robbery," the defendant faces a sentence of 15 years to life. (*Id.*, subd. (b)(4)(B); *People v. Jones* (2009) 47 Cal.4th 566, 571 (*Jones*).) Section 186.22, subdivision (b)(4)(B) is not an enhancement, but rather an "alternate penalty provision," meaning it sets forth an alternate penalty for the underlying offense if the jury finds the conditions specified in the provision have been satisfied. (*Jones*, *supra*, 47 Cal.4th at p. 576.) Standing alone, a home invasion robbery conviction carries a maximum sentence of nine years in prison. (§ 213, subd. (a)(1)(A).) If the offense is found to be gang-related within the meaning of section 186.22, the punishment is life in prison with a minimum parole eligibility period of 15 years. (§ 186.22, subd. (b)(4)(B).)

We note the indictment actually cited to section 186.22, subdivision (b)(1), which is an enhancement provision, and made no reference to subdivision (b)(4)(B). Appellants do not allege prejudice in this regard, and thus impliedly acknowledge that they received adequate notice of their potential exposure to a life sentence under the alternate penalty provision. (See § 960; *People v. Thomas* (1987) 43 Cal.3d 818, 826-827 [failure to cite the correct code section is inconsequential if the accusatory pleading alleges all facts necessary to establish its applicability].)

Beltran, Christopher Escobedo, Estevan Landeros, and Christian Rodriguez. Evidence of an admission made by Centeno during the jail intake process was introduced over an objection that it was obtained in violation of his *Miranda* rights. Leon, Palofox, and Rivas each denied having gang ties during their own jail classification interviews, but the jury learned Palofox subsequently admitted his gang status in conjunction with a request to be transferred out of general population housing for safety reasons. The gang allegations were found true as to Centeno, Leon, and Palofox, but not true with respect to Rivas.

On appeal, Centeno renews his *Miranda* objection and summarily joins in arguments made by Leon. Leon's briefing challenges all of the prosecution's jail classification evidence on grounds that its admission contravened *Miranda* principles and resulted in a violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution. In a related argument, Leon contends that the prosecution introduced testimonial hearsay through the opinions of its gang expert in violation of his constitutional right to confront adverse witnesses. Palofox summarily joins in the positions taken by Centeno and Leon.

During the pendency of this appeal, the California Supreme Court issued its decision in *Elizalde*, *supra*, which addresses and resolves the *Miranda* issue raised by Centeno. It is now settled that the Fifth Amendment right against self-incrimination is implicated when law enforcement officers ask "routine questions about gang affiliation" while processing a defendant into jail. (*Elizalde*, *supra*, 61 Cal.4th at p. 527.) As will be explained, the admission of evidence concerning Centeno's jail classification statements was erroneous under *Elizalde*. The more difficult question is whether the error was prejudicial, and the answer depends in part on the admissibility of the statements made by accomplices/co-conspirators who were not parties to the case. We conclude appellants do not have standing to assert the constitutional rights of those third parties, nor could they have asserted their own Sixth Amendment confrontation rights as a basis for

46.

excluding evidence of the third-party admissions. Given the significance of the accomplices' self-incriminating statements in combination with other admissible evidence presented at trial, the violation of Centeno's *Miranda* rights did not constitute reversible error.

Additional Background Information

Trial of the gang allegations began with a hearing conducted pursuant to Evidence Code section 402 in regards to Centeno's jail classification admissions. The trial court had previously advised defense counsel of its belief that the law was "fairly settled" in terms of there being "no grounds for arguing that there's some kind of Fifth Amendment violation" in the use of such evidence. Each defendant was given the opportunity to argue otherwise, but only Centeno chose to do so. Relying on pre-*Elizalde* case law, the trial court ruled that Centeno's statements during the jail intake process were admissible.

The prosecution's case-in-chief included testimony by correctional officers from the Fresno County jail. Witness Cynthia Diaz described herself as a "jail classification officer" or "population management officer." Her duties involved placing inmates in the appropriate custodial setting based on their responses to a standardized intake interview. The process required interviewees to answer questions listed on a pre-printed form, including, "Do you associate with any street/prison gangs? If yes, explain." All inmates were required to review and sign their completed form.

Officer Diaz conducted two classification interviews with Estevan Landeros. She observed and documented the presence of tattoos on his body of the words "South Side" and of three dots grouped together in a triangular pattern. Recognizing the tattoos as being indicative of a connection to the "Sureno" gang, Officer Diaz was skeptical when Landeros initially denied being a gang member or associate. During the second interview, she advised him that he needed to answer the gang association question truthfully for his own safety. At trial she explained: "If he denied then I would have to put him in general population, [where] we have rival gangs and he would be assaulted."

The majority of inmates in general population housing were members of the regional "Bulldogs" gang, which viewed the Surenos as a rival group. Landeros eventually informed Officer Diaz that he "associated with the Surenos."

The correctional officer who interviewed Centeno testified that he admitted to being a "Sureno from Phoenix." Christian Rodriguez similarly identified himself as a "Phoenix Sureno" during his jail classification interview. Christopher Escobedo admitted to being a "South Side associate from Phoenix," and Gilbert Beltran claimed to be a "South Sider from Phoenix." Beltran and Escobedo were noted to have tattoos of the letters "SS." Escobedo reportedly obtained a three-dot tattoo subsequent to his admission into the jail.

Detective Andrew Simonson of the Fresno County Sheriff's Department testified as the prosecution's gang expert. He explained, based on his training and experience, that the Sureno criminal street gang is controlled by a prison gang known as the "Mexican Mafia." Since most members of the Mexican Mafia are "locked down in protective housing units throughout the state and federal system," they rely on the Surenos to act as their "foot soldiers" outside of prison, generating money for the organization through criminal activity.

The Surenos have a nationwide presence and commonly identify with certain words and symbols. The name itself translates to "southerner," and terms such as "sur" (meaning "south") "south side" or "south sider" are often used to indicate a Sureno affiliation. The number 13 has significance to Surenos because the thirteenth letter of the alphabet is "M," which to them connotes the Mexican Mafia. Gang members will display the number 13 using Roman numerals or a symbol from the Mayan numbering system of two horizontal lines underneath three dots. According to Detective Simonson, the most common tattoo used by Surenos to signify their membership is three dots grouped together in a triangular pattern.

Detective Simonson opined that appellants and their accomplices were all Sureno members or associates. His opinions with respect to the accomplices were primarily based on their admissions during jail classification interviews. The expert stressed that he considered such admissions to be the most reliable form of evidence to determine gang affiliation ("For us it's basically a stand-alone criteria"). As a practical matter, gang members are motived by "self-preservation" to answer jail classification questions truthfully because "[t]hey don't want to be placed in housing with rival gang members where they can be killed [or] assaulted." Falsely claiming association with a particular gang can also be deadly. In Detective Simonson's experience, the occupants of a segregated Sureno "pod" will assault or kill non-Surenos if such individuals are housed with them.

Leon denied having gang ties during his classification interview and was accordingly housed in a minimum security location. Nevertheless, Detective Simonson believed Leon was a Sureno "associate." The expert had personally participated in the execution of a search warrant at Leon's residence in Arizona, and had observed distinctive gang graffiti displayed in various locations on the property. He testified to seeing the number 13 carved into trees near the trailer in which Leon was living, and, in other locations, the three-dot imagery, the words "South Side" and "Hayden Park," and the letters "SS" and "VHPLS." The letters VHPLS purportedly stood for "Vario Hayden Park Locos," a Phoenix area subset of the Surenos. Photographs of the graffiti were admitted into evidence.

The expert's opinions about Leon were further based on his review of police reports and other information provided to him by members of the Phoenix Police Department. According to those sources, Leon had previously been seen wearing gang clothing and was known to associate with Estevan Landeros. Phoenix police believed Landeros and Leon were both part of the Vario Hayden Park Locos.

49.

As to Centeno, the expert relied on "jail classifications as well as Phoenix Police reports." These records indicated that Centeno had gang tattoos and belonged to a Sureno subset known as the "Vario Happy Homes Locos." He was also known to associate with Palofox and Gilbert Beltran.

On direct examination, Detective Simonson opined that Palofox was a Sureno member based upon his review of "the Phoenix Police reports as well as local classification documents." On cross-examination, Palofox's attorney elicited testimony from the expert regarding his client's denial of gang membership during a classification interview at the Fresno County Jail – information not previously disclosed in front of the jury. Defense counsel also successfully moved to have Palofox's signed jail classification questionnaire admitted into evidence. This line of questioning led to the revelation that Palofox had later requested to be transferred from general population housing out of fear for his safety: "Originally he was placed with Bulldogs. He was – he told the CO that the Bulldogs overheard him talking to his family and stated he slipped. And then he admitted to the classification officers that he was a South Sider and he no longer [felt] comfortable housed with any Bulldogs."

Finally, with respect to Rivas, the expert acknowledged there was no evidence to indicate he was a gang member. Detective Simonson believed Rivas had associated with gang members through his involvement with the codefendants and other accomplices, but conceded there was no evidence Rivas actually knew those individuals were members of a gang. As stated above, the gang allegations against Rivas were found not to be true.

The *Elizalde* Decision

In *Elizalde*, the California Supreme Court considered "whether routine questions about gang affiliation, posed to [a] defendant while processing him into jail on murder charges, come within *Miranda*'s well-recognized booking exception." (*Elizalde*, *supra*, 61 Cal.4th at p. 527.) The key holding of the opinion is as follows: "Gang affiliation questions do not conform to the narrow exception contemplated in [*Rhode Island v. Innis*

50.

(1980) 446 U.S. 291 (*Innis*)] and [*Pennsylvania v. Muniz* (1990) 496 U.S. 582] for basic identifying biographical data necessary for booking or pretrial services. Instead, they must be measured under the general *Innis* test, which defines as 'interrogation' questions the police should know are 'reasonably likely to elicit an incriminating response.'" (*Elizalde*, *supra*, 61 Cal.4th at p. 538.) Whether or not a gang-related inquiry by jail personnel requires a *Miranda* admonition will depend on the nature of the charges the inmate is facing.

The *Elizalde* defendant was asked gang affiliation questions by sheriff's deputies who were aware he had been charged with murder but did not know the offense was gang-related. (*Elizalde*, *supra*, 61 Cal.4th at p. 529.) Ignorance of the latter circumstance was immaterial because murder is "a crime frequently committed for the benefit of criminal street gangs, and a qualifying offense establishing a '"pattern of criminal gang activity"'" for purposes of section 186.22. Therefore, the questions were likely to elicit an incriminating response and needed to be prefaced with a *Miranda* admonition, "even if the deputies' subjective intention was benign." (*Elizalde,* at p. 540.) "While officers were permitted to ask these questions for institutional security purposes, defendant's un-*Mirandized* responses were inadmissible against him during the [prosecution's] case-in-chief." (*Id*. at p. 527.)

Under *Elizalde*, Centeno's objection to the admission of his jail classification statements should have been sustained. The jail classification officer who interviewed him knew of his connection to the other inmates from Arizona, and the record indicates the officer would have also been aware of his charges. As discussed in footnote 8, *ante*, robbery in concert in violation of section 213, subdivision (a)(1)(A) is subject to punishment under the alternate penalty provision in section 186.22, subdivision (b)(4)(B). These circumstances made it reasonably likely that the gang affiliation question would elicit an incriminating response, and a *Miranda* admonishment was therefore required.

51.

Palofox's situation does not fit squarely within the parameters of the *Elizalde* decision. It appears he approached correctional officers on his own accord and volunteered information about his gang status in conjunction with a request for alternate housing arrangements. The record does not demonstrate that his admission was the product of interrogation. He has made no effort to argue this issue on appeal, and we will not endeavor to make arguments on his behalf. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364 [although joinder of claims is broadly permitted, "'each appellant has the burden of demonstrating error and prejudice'"].) Under current law, a gang expert's opinion may be based on hearsay, and when testifying, he or she may describe the material that forms the basis for their opinion. (*People v. Gardeley* (1996) 14 Cal.4th 605, 618.) We therefore assume Detective Simonson's testimony in regards to Palofox's admission was permissible.

Due Process Considerations

Leon claims his due process rights were violated by the admission of evidence of his co-conspirators' jail classification statements. He argues those statements were coerced in that each person faced a Hobson's choice of providing self-incriminating information or jeopardizing their personal safety by being housed with rival gang members. Leon further alleges ineffective assistance of counsel based on his trial attorney's failure to make these arguments below.

"It is settled that the accused has no standing to object to a violation of another's Fifth Amendment privilege against self-incrimination." (*People v. Badgett* (1995) 10 Cal.4th 330, 343 (*Badgett*).) However, a defendant does have limited standing to assert that his own due process right to a fair trial has been violated through the admission of improperly obtained statements made by a third party. (*Williams, supra,* 49 Cal.4th at p. 452; *People v. Jenkins* (2000) 22 Cal.4th 900, 966 (*Jenkins*).) This relatively uncommon issue has arisen in the context of a challenge to coerced trial testimony, and in relation to the "fruits" of a third party's involuntary out-of-court

52.

statements.  (*Williams*, *supra*, 49 Cal.4th at pp. 452-454; *Jenkins*, *supra*, 22 Cal.4th at pp. 966-967; *Badgett*, *supra*, 10 Cal.4th at pp. 342-348; *People v. Douglas* (1990) 50 Cal.3d 468, 501-505; *People v. Varnum* (1967) 66 Cal.2d 808, 811-813.)  Leon cites to most of these cases in his briefs, but provides no further authority regarding due process challenges to the type of evidence at issue here.

"The violation of a third party's privilege against self-incrimination may deprive a defendant of his or her due process rights if such action adversely affects the reliability of testimony offered against defendant at trial."  (*Jenkins*, *supra*, 22 Cal.4th at p. 966.) "[W]hen the defendant's claim is based upon the involuntariness of a third party's statement, the exclusionary rule applicable to a claimed violation of the privilege against self-incrimination does not apply.  [Citation.]  Rather, the defendant may prevail only by demonstrating fundamental unfairness at trial, normally by establishing that evidence to be produced at trial was made unreliable by coercion."  (*Ibid.*; see *Badgett*, *supra*, 10 Cal.4th at p. 348 ["Testimony of third parties that is offered at trial should not be subject to exclusion unless the defendant demonstrates that improper coercion has impaired the reliability of the testimony."].)

Respondent argues there is no due process violation under the framework set forth in cases such as *Jenkins* and *Badgett* because the circumstances in which the statements of Leon's co-conspirators were made, and the independent evidence of their gang affiliations, overwhelmingly demonstrate that the admissions were reliable.  Leon does not disagree with the reliability argument, but submits that a due process violation should be found because the third-party admissions were procured by "outrageous police misconduct."  We find respondent's argument to be more persuasive given the authorities upon which the parties have relied.  The *Elizalde* decision may inevitably lead to future claims that even *Mirandized* jail classification admissions are inherently coercive, but we need not resolve that issue in order to dispose of Leon's current claim.  The ineffective assistance claim fails pursuant to the foregoing analysis and given the state of the law at

the time of trial.  (See *People v. Welch* (1993) 5 Cal.4th 228, 237 ["Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence."].)

Sixth Amendment Considerations

Leon alleges a violation of his Sixth Amendment rights under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).  Two categories of evidence are relevant to his claim.  He describes the first category as "hearsay evidence from Phoenix police," referring to the documents and verbal information Detective Simonson obtained from Arizona law enforcement officers and relied upon in forming his expert opinions.  The second category is comprised of the jail classification admissions of his codefendants and third-party accomplices.

"The confrontation clause of the Sixth Amendment to the federal Constitution, made applicable to the states through the Fourteenth Amendment, provides that '[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him.'  The right of confrontation includes the right of cross-examination." (*People v. Fletcher* (1996) 13 Cal.4th 451, 455.)  In *Crawford*, the United States Supreme Court held that the confrontation clause bars the admission of out-of-court testimonial hearsay statements except when "the declarant is unavailable …" and the defendant "had a prior opportunity to cross-examine" the declarant.  (*Crawford*, *supra*, 541 U.S. at p. 59.)

The issue of whether a defendant's Sixth Amendment right to confrontation is violated by a gang expert's reliance on testimonial hearsay is currently pending before the California Supreme Court.  (*People v. Sanchez*, review granted May 14, 2014, S216681; *People v. Archuleta*, review granted June 11, 2014, S218640 [briefing deferred pending consideration and disposition of *Sanchez*]; *People v. Eberhart*, review granted November 24, 2015, S229864 [same].)  We decline to speculate as to how the issue will be decided, and conclude the verdict in this case would have been the same even without

54.

Detective Simonson's testimony regarding the contents of Phoenix police reports and his conversations with out-of-state law enforcement officers. (See further discussion, *infra*.) The outcome would likely have been different if appellants' Sixth Amendment rights were implicated by evidence of their accomplices' jail classification admissions, but for the reasons that follow we conclude those admissions were not "testimonial" for purposes of *Crawford*.

In *Elizalde*, our Supreme Court determined that jail classification interviews are a form of custodial interrogation for purposes of the Fifth Amendment insofar as the questioning is likely to elicit an incriminating response. (*Elizalde*, *supra*, 61 Cal.4th at p. 531, 538-539.) However, while responses to such interrogation may be considered "testimonial" in a Fifth Amendment context, the same is not necessarily true for purposes of the Sixth Amendment. (*Id*. at p. 533, fn. 7.) The *Elizalde* opinion contains a footnote on this point that states, in pertinent part: "This case in no way implicates the court's *Crawford* jurisprudence." (*Ibid*.)

The *Crawford* opinion does not define the term "testimonial," but says it "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Crawford*, *supra*, 541 U.S. at p. 68.) As originally decided, *Crawford* left no room for debate over the last category: "Statements taken by police officers in the course of interrogations are [] testimonial under even a narrow standard." (*Id*. at p. 52.) The high court revised its position in *Davis v. Washington* (2006) 547 U.S. 813 (*Davis*) to make an exception for emergency situations. The *Davis* case instructs that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis*, *supra*, 547

55.

U.S. at p. 822.)  This aspect of the opinion has come to be known as the "primary purpose" test.  (*Ohio v. Clark* (2015) ___ U.S. ___ [135 S.Ct. 2173, 2179] (*Clark*).)

Since *Davis*, the United States Supreme Court has adopted the view that "not all those questioned by the police are witnesses" for purposes of the Sixth Amendment and not all "'interrogations by law enforcement officers' [citation], are subject to the Confrontation Clause.'"  (*Michigan v. Bryant* (2011) 562 U.S. 344, 355 (*Bryant*), quoting *Crawford*, *supra*, 541 U.S. at p. 53.)  Hearsay evidence must now satisfy the primary purpose test in order to be considered testimonial for purposes of the Sixth Amendment right to confront and cross-examine adverse witnesses.  (*Clark*, *supra*, __ U.S. at p. __ [135 S.Ct. at p. 2180]; *People v. Chism* (2014) 58 Cal.4th 1266, 1288-1289 (*Chism*).)  In its current formulation, the test asks whether the statement at issue was "procured with a primary purpose of creating an out-of-court substitute for trial testimony."  (*Bryant*, *supra*, 562 U.S. at p. 358.)  The California Supreme Court has described the test in substantially similar terms: "First, to be testimonial the statement must be made with some degree of formality or solemnity.  Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution."  (*People v. Dungo* (2012) 55 Cal.4th 608, 619.)

The primary purpose test is essentially a totality of the circumstances analysis.  "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred."  (*Bryant*, *supra*, 562 U.S. at p. 360.)  "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'"  (*Clark*, *supra*, __ U.S. at p. __ [135 S.Ct. at p. 2180].)  "'Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.'"  (*Ibid.*)

Here, the statements in dispute were made with a sufficient degree of formality. However, we cannot conclude the primary purpose of those statements – from the perspective of either the person asking the questions or the person answering them – was to create an out-of-court substitute for trial testimony or to otherwise contribute to a criminal investigation or prosecution. Nothing suggests that Leon's codefendants and third-party accomplices disclosed gang membership or affiliation for the purpose of making a confession against themselves or an accusation against someone else. Likewise, based on all of the available evidence, including testimony by the correctional officers who appeared at trial, we are convinced the *primary* purpose for the gang affiliation questions was to further institutional security objectives, i.e., to ensure the safety of inmates and jail personnel. The answers to those questions also had evidentiary value from a prosecutorial standpoint, but the objective primary purpose "reasonable participants would have had" in this context was not the creation of an out-of-court substitute for trial testimony. (*Bryant*, *supra*, 562 U.S. at p. 360.) Therefore, appellants did not have a Sixth Amendment right to cross-examine each other or their accomplices about the jail classification admissions.

Prejudice

The erroneous admission of a jail classification statement obtained in violation of *Miranda* is reviewed for prejudice under the standard articulated in *Chapman v. California* (1967) 386 U.S. 18. (*Elizalde*, *supra*, 61 Cal.4th at p. 542.) The People must show, beyond a reasonable doubt, that the error did not contribute to the jury's verdict. (*Ibid*.) "'To say that an error did not contribute to the ensuing verdict is … to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision." (*People v. Neal* (2003) 31 Cal.4th 63, 86.) The error in *Elizalde* was found to be harmless because the defendant's gang connections were established through independent evidence.

57.

Focusing on what the jury actually decided in this case, we cannot ignore its findings as to Rivas. Both Leon and Rivas denied having gang ties during their jail classification interviews, but only Rivas was exonerated. Rivas stood apart from his co-conspirators as the only member of the conspiracy from California. The other men resided in or around Phoenix, Arizona. Rivas's only apparent connection to the group was that he had dated Estevan Landeros's sister during the relevant time period. When Rivas took the stand in the first phase of trial, he denied having any involvement in the robberies and claimed to be barely acquainted with Landeros.

A trier of fact can rationally infer a crime was committed "in association" with a criminal street gang within the meaning of section 186.22, subdivision (b) if the defendant committed the offense in concert with gang members. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.) "There is no further requirement that the defendant act with the specific intent to promote, further, or assist a gang; the statute requires only the specific intent to promote, further, or assist criminal conduct by gang members." (*People v. Albillar* (2010) 51 Cal.4th 47, 67, italics omitted.) Rivas was convicted of participating in all five robberies, and there was overwhelming evidence that the crimes were committed in association with gang members, yet the jury found the section 186.22 subdivision (b) allegations not true. Assuming jurors followed the instructions they were given, the only logical explanation for this outcome is that they believed Rivas did not actually know his accomplices were members of a gang. In assessing the potential for prejudice in the admission of Centeno's jail classification statements, we must consider whether the absence of such evidence could have raised similar doubts as to Leon, Centeno, and/or Palofox.

Only Leon and Rivas were convicted on Count 9, i.e., the robbery which took place in Kerman on March 15, 2010. Because Centeno was not accused of participating in this offense, it stands to reason that his jail classification statements did not impact the jury's findings with respect to Leon on that count. Since the jury impliedly found Rivas

58.

was neither a gang member nor gang associate, it would appear Leon's culpability under section 186.22 was based on his association with the third-party accomplices, most likely Estevan Landeros and Christian Rodriguez. Numerous victims had identified Landeros and Rodriguez to police and/or during their trial testimony, and both men were alleged to have participated in all five robberies.

Cell phone evidence showed Leon was in contact with Landeros during the course of the conspiracy. Eyewitness testimony also placed Leon and Landeros together on various dates. Their connection to one another was sufficiently established even without the information contained in the Phoenix police reports, which certainly reinforced the other evidence of Leon's gang ties. Unlike with Rivas, Leon's familiarity with the Surenos could be inferred from the gang graffiti displayed outside of his residence. The graffiti evidence was based on Detective Simonson's personal observations rather than hearsay, and the corresponding photographs were admitted at trial. In summary, the record demonstrates beyond a reasonable doubt that the gang finding for Leon on Count 9 would have been the same with or without evidence of Centeno's jail classification admission.

Counts 11 and 16 respectively pertained to the robberies in Atwater and Selma on March 16, 2010. Since each appellant was convicted of these crimes, Palofox's admission of gang membership effectively forecloses any claims of prejudice by Leon and Centeno. As to them, the section 186.22 findings were further substantiated by the admissions of their co-conspirators, most of whom were further shown to be Sureno members through evidence of their gang tattoos. Cell phone records indicated that Centeno had calls on March 16, 2010 to or from phones associated with Gilbert Beltran, Christopher Escobedo, and Christian Rodriguez. His phone was in regular contact with a number associated with Christian Rodriguez during February and March of that year. Thus, even without evidence of his jail classification admission, it was firmly established

59.

that Centeno committed Counts 11 and 16 in association with gang members and with the intent to further or assist in the conduct of gang members.

Palofox's gang findings were established through his own admissions and by evidence of co-defendant Leon's gang associations. The victim of the Count 11 robbery had also identified Estevan Landeros and Christian Rodriguez as being among the perpetrators who entered his home, thus removing any doubt about the gang-related nature of that offense. The Count 16 findings were further established by evidence of Gilbert Beltran's involvement. Beltran pawned a ring that was stolen during this robbery after the group returned to Arizona. Palofox was reportedly living with Beltran at the time of his arrest, and the jury heard recordings of a discussion between Palofox and Beltran in which both incriminated themselves. For all of these reasons, it is evident beyond a reasonable doubt that the jury's verdict was not tainted by the erroneous admission of Centeno's jail classification statements.

**Sentencing**

   A. <u>Consecutive Sentences for Gang-Related Home Invasion Robberies</u>

Centeno, Leon, and Palofox received consecutive sentences of 15 years to life for their gang-related robbery convictions pursuant to the trial court's conclusion that such punishment was mandatory under the holding of *People v. Felix* (2000) 22 Cal.4th 651 (*Felix*). As a result, Leon's convictions on Counts 9, 11, and 16 resulted in an aggregate term of 45 years to life in prison. Centeno and Palofox each received sentences of 30 years to life for their convictions on Counts 11 and 16. On appeal, Centeno and Palofox argue the trial court misconstrued the *Felix* decision and acted under a mistaken belief that it had no discretion to impose concurrent sentences for any of the robbery convictions. Leon summarily joins in this claim.

The Attorney General submits that the issue is forfeited as a result of appellants' failure to object at the time of sentencing. However, she impliedly concedes the merits of appellants' argument by urging us to find, to the extent the claim is reviewable, that "the

60.

trial court fully understood its discretionary power" and "properly exercised its discretion to select consecutive sentences." We conclude appellants have carried their burden of establishing error.

Regarding forfeiture, the error complained of may fall within a narrow class of sentencing issues that are reviewable in the absence of a timely objection. "'Failure to exercise a discretion conferred and compelled by law constitutes a denial of a fair hearing and a deprivation of fundamental procedural rights, and thus requires reversal. [Citations.]' [Citation] Where, as here, a sentence choice is based on an erroneous understanding of the law, the matter must be remanded for an informed determination." (*People v. Downey* (2000) 82 Cal.App.4th 899, 912.) In any event, we would exercise our discretion to resolve the claim in the interests of fairness and judicial economy, since the matter is already being remanded for other sentencing matters, and to forestall unnecessary ineffective assistance of counsel claims. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6; *People v. Lewis* (1990) 50 Cal.3d 262, 282.)

1. Background

At Leon's sentencing hearing, defense counsel made statements regarding the anticipated length of his client's sentence given the section 186.22, subdivision (b) findings. Following a response by the prosecutor, the trial court said: "*People* [*v.*] *Felix*, 22 Cal.4th 651 in 2000. California Supreme Court directly concluded that indeterminate terms of this nature must be served fully consecutive to each other… We all fully understand it whether we agree with it or not. When I say 'we,' I mean the defense, not necessarily the court." Later, during the pronouncement of sentence, the court stated: "I'm ordering you committed to the Department of Corrections on count – each of these counts Nine, Eleven, and Sixteen as required by law to the term of 15 years to life. Each of those 15 year-to-life terms to run consecutive to each other as pursuant to the case authority that I just referenced here on the record."

While sentencing Centeno, the trial court indicated that it would have been inclined to grant him leniency if it had discretion to do so. The relevant statements were as follows:

"The issue, of course, is what sentence the court should impose. And it seems to me I would agree with the prosecution that in light of everything that I've read here, that the court really does not have authority to do otherwise but to impose the sentences with respect to Counts Eleven and Sixteen. But I want to say, in fairness to Mr. Centeno here, and to some future court evaluating this, that if the court believed and understood that it did have the authority to exercise discretion, I might. I might have done that with respect to Mr. Centeno, primarily because of his age and his involvement with a lot of other adults who certainly should have known better.

And so, you know, I think I want to make – leave that door open here, because I don't know what the Appellate Court might do in the future on this subject. But this is a situation where, given his limited involvement in this matter and his age as a minor – that's the most important thing in this court's view, being a minor at the time of the commission of these crimes – that the court might have exercised its discretion to do other than impose life terms on this case. But in the court's view, for the reasons that counsel here from the People have a cited authority which is primarily the case of [*People v. Jones*, *supra*, 47 Cal.4th 566] [the] California Supreme Court has made it clear that sentencing for the crime of robbery in concert, you know, in a home invasion robbery scenario for gang purpose, which is what the jury found to be true here, that that's not an enhancement. And in this court's view, therefore, is not subject to relief under [section] 186.22(g) that the defense has asked the court to make – grant a motion to strike. This is, in fact, an alternate sentence for this crime. And the court has no authority but to impose that alternate sentence.

And under the cases that I think I've cited earlier, and I'll make reference to now, which is *People* [*v.*] *Felix*, that's 22 Cal.4th 651, F-E-L-I-X, that's a 2000 decision of the California Supreme Court, Mr. Lindahl. 22 Cal.4th 651. Essentially, what that says is where there is separate home invasion robberies they are required to be served fully consecutive – mandatory full consecutive terms…[T]he mandatory sentence, the only sentence this court can impose is 30 years to life."

The trial court referenced *Felix* yet again during the pronouncement of sentence for Palofox: "…I do agree with your attorney, however, that in light of your personal involvement that there is no good reason in this court's view to impose any consecutive

62.

sentencing on the other counts which are, essentially, derivative. Therefore, under *People* [*v.*] *Felix* which I've cited earlier and in light of the jury's findings in this matter, I am ordering you with respect to Counts Eleven and [Sixteen] to be committed to the Department of Corrections for the term of 15 years to life in each of those counts."

2. Analysis

Contrary to the statements of the trial court, the *Felix* case does not involve alternate penalty provisions, nor does it reference home invasion robberies or section 186.22. The opinion addresses how *enhancements* are applied to indeterminate sentences. (*Felix*, *supra*, 22 Cal.4th at pp. 654-659.) A term of imprisonment for life or a specified number of years to life is an indeterminate sentence for purposes of California's statutory sentencing scheme (§ 1170, et seq.). (*Felix*, *supra*, 22 Cal.4th at pp. 657-659.) The *Felix* opinion merely holds that *if* a trial court elects to impose consecutive sentences for two or more offenses that require indeterminate life terms, any enhancements attached thereto must be imposed for the full term of the enhancement, rather than one-third of the term as would ordinarily be done under the determinate sentencing laws. (*Id*. at p. 655-656.)

Under section 669, a trial court has discretion to determine whether to impose sentences consecutively or concurrently. The existence of such discretion is explicitly recognized in the *Felix* opinion. (*Felix*, *supra*, 22 Cal.4th at p. 655 ["Whenever a person is convicted of two or more crimes, the court must impose either concurrent or consecutive sentences. (§ 669.)"].) The Legislature may remove this discretion for certain crimes, but exceptions are typically made clear in the statutory language of the offense. (See, e.g., § 667.6, subd. (d) [sex crimes committed under specified circumstances]; § 4501.5 [battery committed by a prisoner against a non-prisoner].) Unless otherwise prohibited by statute, sentences for crimes that carry indeterminate life terms may be imposed concurrently. "That the court's authority to impose either concurrent or consecutive sentences includes life sentences is made clear by further

63.

language in section 669, which provides: 'Life sentences, whether with or without the possibility of parole, may be imposed to run consecutively with one another, with any term imposed for applicable enhancements, or with any other term of imprisonment for a felony conviction.'" (*In re Maes* (2010) 185 Cal.App.4th 1094, 1099.)

The trial court seems to have conflated two different provisions of section 186.22. Subdivision (b)(1) of the statute provides: "*Except as provided in paragraphs (4) and (5),* any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished [in accordance with subdivision (b)(1)(A), (B) or (C)]." (Italics added.) In contrast, subdivision (b)(4) provides, in pertinent part: "Any person who is convicted of a felony enumerated in this paragraph committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, be sentenced to an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as the greater of … (B) Imprisonment in the state prison for 15 years, if the felony is a home invasion robbery, in violation of subparagraph (A) of paragraph (1) of subdivision (a) of Section 213…"

As previously discussed, section 186.22, subdivision (b)(1) is an enhancement provision, while subdivision (b)(4) of the statute is an alternate penalty provision. (*Jones*, *supra*, 47 Cal.4th at p. 576; *People v. Briceno* (2004) 34 Cal.4th 451, 460, fn. 7.) The latter does not expressly require consecutive sentencing. Trial courts have discretion under section 669 to impose concurrent sentences for multiple convictions of crimes subject to the alternate penalty of 15 years to life under section 186.22, subdivision (b)(4)(B), and *Felix* does not hold otherwise.

64.

Relief from a trial court's misunderstanding of its sentencing discretion is available on direct appeal when such misapprehension is affirmatively demonstrated by the record. (See *People v. Meloney* (2003) 30 Cal.4th 1145, 1151; *People v. Fuhrman* (1997) 16 Cal.4th 930, 945.) Here, the trial court's repeated citation to *Felix*, combined with statements regarding its purported lack of discretion to impose anything other than consecutive sentences for the gang-related home invasion robberies, is most reasonably interpreted as confusion over the scope of its sentencing authority. Since the record does not conclusively show whether the trial court would have exercised its discretion to impose concurrent terms on the robbery convictions if it had known that it had such discretion, appellants are entitled to relief. (*People v. Gamble* (2008) 164 Cal.App.4th 891, 901.) The appropriate remedy is a limited remand to give the trial court an opportunity to exercise its discretion under section 669 as to Counts 9, 11, and 16. (*Ibid*; accord, *People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8; *People v. Brown* (2007) 147 Cal.App.4th 1213, 1228 ["Generally, when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing."].) On remand, the trial court shall exercise its discretion to run the sentences for these counts consecutively or concurrently, and state the reasons for its decision.[9] (Cal. Rules of Court, rule 4.406(b)(5).)

---

[9] The transcript excerpts quoted above also reflect the trial court's consideration of a separate issue concerning whether it had discretion to strike the gang findings to circumvent the alternate penalty requirements of section 186.22, subdivision (b)(4). Similar questions are currently pending before the California Supreme Court. (*People v. Venegas*, review granted Dec. 10, 2014, S221923; *People v. Fuentes*, review granted Aug. 13, 2014, S219109.) We express no opinion on the issue, as it is not properly before us in this appeal. Remand on Counts 9, 11, and 16 shall be solely limited to the court's discretion to impose consecutive or concurrent sentences.

B.  Cruel and Unusual Punishment

Centeno contends that the indeterminate sentence of 30 years to life in prison is a "de facto" sentence of life without parole, which, given that he was a 17-year-old juvenile at the time of the offenses, violates the constitutional guarantee against cruel and unusual punishment.  The claim is effectively mooted by our remand for further proceedings on the counts upon which his sentence is based.  His argument is also meritless.

A prison term falling within the Legislature's sentencing guidelines is considered cruel and unusual punishment in only the rarest of circumstances.  (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.)  In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), our Supreme Court held that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment."  (*Id*. at p. 268.)  The *Caballero* defendant was sentenced to 110 years to life for a gang-related attempted murder offense committed when he was 16 years old.  (*Id*. at p. 265.)  The length of the sentence was characterized as a de facto term of life without the possibility of parole.  (*Id*. at p. 269, fn. 5.)

The trial court below observed that Centeno's sentence of 30 years to life would make him eligible for parole by the time he is 49 years old, "which is clearly not outside of any natural life expectancy he might have."  Centeno has not refuted this finding on appeal.  Furthermore, the enactment of section 3051 ensures he will be eligible for release on parole during his 20th year of incarceration.  (§ 3051, subd. (b)(2).)  We thus reject his cruel and unusual punishment claim.

C.  Section 654 Issues

Appellants raise challenges under section 654 to the trial court's imposition of certain concurrent and consecutive sentences which they argue should have been stayed. Palofox and Rivas allege error in relation to Counts 13 and 14 with respect to the crimes of assault with a firearm and making criminal threats.  Only Rivas was sentenced to

consecutive terms for these offenses.  Palofox and Rivas further complain of concurrent sentences imposed for their convictions of vehicle theft in Counts 8 (Rivas only), 15, and 18.  Centeno and Leon summarily join in these arguments to the extent they are relevant to their own sentences.

<u>Applicable Law</u>

Section 654 prohibits multiple punishment for crimes arising out of a single act or indivisible course of conduct.  (*Id.*, subd, (a); *People v. Hester* (2000) 22 Cal.4th 290, 294.)  The defendant's intent and objective determines whether two crimes are part of an indivisible course of conduct.  (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)  "When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an implied finding each offense had a separate objective."  (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.)  Such findings are upheld on appeal if supported by substantial evidence.  (*Ibid.*)

In the absence of separate and distinct objectives, it is error to impose concurrent sentences instead of staying the execution of sentence for those convictions to which section 654 applies.  Errors of this nature are reviewable on appeal regardless of whether a timely objection was made at the time of sentencing.  (*People v. Brents* (2012) 53 Cal.4th 599, 618.)  "Accordingly, although there appears to be little practical difference between imposing concurrent sentences, as the trial court did, and staying sentence on two of the convictions," we must consider the merits of appellants' arguments.  (*People v. Jones* (2012) 54 Cal.4th 350, 353.)

<u>Criminal Threats and Aggravated Assault</u>

Counts 13 and 14 pertained to the incident involving victim Fernando Guzman.  Our modification of the judgment to reflect convictions under Count 13 of assault with a firearm (§ 245, subd. (a)) does not alter the section 654 analysis.  Appellants were convicted under Count 14 of making criminal threats in violation of section 422.  Rivas

and Palofox submit that threatening Mr. Guzman and assaulting him with a firearm comprised a single act done pursuant to the objective of making him comply with their demands for money. The trial court was not persuaded by this argument, nor are we.

Mr. Guzman was holding his infant daughter when he was accosted by approximately eight gunmen, each of whom pointed their weapons at him and his child. When he told the men there was no money in the house, one of them grabbed the baby out of his hands and another hit him in the back of the head with what he believed was a gun. After he fell to the ground, they punched and kicked him for an extended period of time. He was then moved to another room, tied up, and left there with his daughter and one of the robbers while the rest of the people ransacked his house.

Later, as he was lying tied up on the ground, the robbers reconvened and he heard one of them say, "Let's smoke this guy." Fearing for his life, Mr. Guzman requested that his daughter be taken into another room so she would not see him get shot. They ignored his request, and one of them pointed a gun at him and pulled the trigger. When the gun did not fire, the robbers began to laugh.

We find the Fourth District's conclusions in *People v. Nguyen* (1988) 204 Cal.App.3d 181 particularly relevant here. "[A]t some point the means to achieve an objective may become so extreme they can no longer be termed 'incidental' and must be considered to express a different and more sinister goal than mere successful commission of the original crime. . . . [¶] . . . [¶] . . . [S]ection [654] cannot, and should not, be stretched to cover gratuitous violence or other criminal acts far beyond those reasonably necessary to accomplish the original offense." (*Id*. at p. 191.) The evidence supporting Counts 13 and 14 permits the finding of separate intents and objectives despite the related course of conduct. We therefore reject all section 654 arguments as to those offenses.

Robbery and Vehicle Theft

In each of the robberies that occurred in Counts 5, 11, and 16, a vehicle was stolen from the victims' home. The vehicles were later found abandoned at nearby locations.

68.

Appellants were convicted of vehicle theft within the meaning of Vehicle Code section 10851, subdivision (a) on Counts 8 (Rivas only), 15, and 18. None of the parties objected to the imposition of concurrent sentences on these counts, and the trial court's reasons for not applying section 654 do not appear in the record.

Robbery is a continuing offense that begins at the time property is taken from another by force or fear and ends when the robber reaches a place of temporary safety. (*People v. Anderson* (2011) 51 Cal.4th 989, 994.) In *People v. Bauer* (1969) 1 Cal.3d 368 (*Bauer*), two robbers entered a home, threatened the occupants with weapons, tied them up, stole various items, and drove off in an automobile which belonged to one of the victims. (*Id*. at p. 372.) The California Supreme Court held that section 654 precluded separate punishment for the vehicle theft conviction under the circumstances of the case. The decision was based on the general principle that "where a defendant robs his victim in one continuous transaction of several items of property, punishment for robbery on the basis of the taking of one of the items and other crimes on the basis of the taking of the other items is not permissible." (*Id*. at p. 377.)

After reviewing the record, we are unable to distinguish this case from *Bauer* in any material respect. Appellants are therefore entitled to have their sentences on Counts 8, 15, and 18 stayed. We remand for resentencing on these counts with instructions that the trial court comply with section 654.

## DISPOSITION

The judgments are affirmed in part and reversed in part. As to Rivas, the judgment is modified to reflect a conviction under Count 4 of the lesser included offense of attempting to prevent a victim or witness from reporting a crime in violation of section 136.1, subdivision (b)(1). As to Centeno, Leon, Palofox, and Rivas, the judgments are modified to reflect convictions under Count 13 of the lesser included offense of assault with a firearm in violation of section 245, subdivision (a)(2). Subject to these

69.

modifications, all convictions and all findings as Centeno, Leon, Palofox, and Rivas are affirmed.

As to Centeno, the sentences imposed for Counts 11, 13, 15, 16, and 18 are reversed subject to the conditions set forth herein. Centeno shall be resentenced for these counts on remand in a manner consistent with this opinion. As to Leon, the sentences imposed for Counts 9, 11, 13, 15, 16, and 18 are reversed subject to the conditions set forth herein. Leon shall be resentenced for these counts on remand in a manner consistent with this opinion. As to Palofox, the sentences imposed for Counts 11, 13, 15, 16, and 18 are reversed subject to the conditions set forth herein. Palofox shall be resentenced for these counts on remand in a manner consistent with this opinion. As to Rivas, the sentences imposed for Counts 4, 8, 13, 15, and 18 are reversed subject to the conditions set forth herein. Rivas shall be resentenced for these counts on remand in a manner consistent with this opinion. In all other respects, the judgments are affirmed.

_____

GOMES, J.

WE CONCUR:

_____

HILL, P.J.

_____

DETJEN, J.